STEPHENS v. DETROIT TRUST CO.

1. APPEAL AND ERROR—QUESTIONS REVIEWABLE.
    In suit for accounting as to an extensive estate handled by defendant, complaint relative to investments in real estate mortgages is not considered where defendant offered to repurchase same.

2. PRINCIPAL AND AGENT—GOOD FAITH—SKILL REQUIRED OF AGENT.
    An agent is bound to act in good faith and exercise reasonable skill, care, diligence and judgment in acting in behalf of its principal.

3. BANKS AND BANKING—TRUST COMPANY—SPECIAL SKILL.
    Trust company which held itself out to elderly widow as especially skilled in undertaking to manage and handle her investments became obligated to use that degree of care and skill which would ordinarily be exercised at that time by one performing similar functions under like circumstances.

4. PRINCIPAL AND AGENT—CONSTRUCTION OF CONTRACTS.
    Mere reference to party to an agreement as agent and to the agreement itself as agency agreement held, not decisive that relationship was in fact an agency but is a circumstance entitled to consideration in disposing of the question.

5. SAME—CONTRACT—TRUSTS—POWERS OF PARTIES.
    Agreement between wealthy widow and trust company, which designated it as agent, provided that title to the property involved should remain in her and gave her the power of revocation held, to establish relationship of agency rather than one of trust especially in view of subsequent action of widow with reference to the estate and failure of record to exhibit exercise by trust company of the discretion of a trustee but rather the exercise, as agent, of the will of plaintiff as principal.

6. SAME—TRUSTS—SEPARATION OF LEGAL FROM EQUITABLE TITLE.
    The separation of the legal from the equitable title is one distinction between a trust and an agency, the trustee holding legal title and the agent having no title.

7. TRUSTS—REVOCATION.

Retention of the power of revocation is not necessarily inconsistent with a trust relationship yet it is not indicative of a trust.

8. PRINCIPAL AND AGENT—NATURE OF RELATION.

Agency is formed with the thought of constant supervision and control by the principal.

9. TRUSTS—NATURE OF RELATION.

A trust is based on the idea of discretion in the trustee and guidance by the settler or *cestui* only to a limited extent and when expressly provided for.

10. BANKS AND BANKING—TRUST COMPANIES—STANDARD OF CARE.

Provision in agreement whereby trust company, therein constituted an agent, should be liable for loss only in case of its bad faith or wilful default *held*, valid.

11. SAME—TRUST COMPANY—SALE OF COMMON STOCKS.

Plaintiff, a wealthy widow who had left her estate with defendant trust company as agent for handling, *held*, not to have sustained her burden of proof, in suit for accounting, that she gave a general order to sell all her common stocks, the alleged failure to obey which resulted in losses to her estate.

12. SAME—SALE OF BANK STOCK.

Plaintiff, a wealthy widow who had left her estate with defendant trust company as agent for handling, *held*, not to have sustained her burden of proof in suit for accounting that express instructions to sell bank stock had been given in time to avoid the losses sustained.

13. SAME—PURCHASE OF COMMON STOCKS.

Widow who knew trust company had purchased common stocks for her pursuant to authority given in agency agreement or at her express direction *held*, not entitled to complain of losses sustained where corporations whose stocks were purchased were generally considered to be sound financially at the time and were comparable to type of stocks in estate when it was turned over to defendant for handling, the purchases made being proper, an exercise of good faith and sound investment judgment by defendant agent.

14. SAME—NEGLIGENCE—EVIDENCE.

In suit by wealthy widow for accounting by trust company which had acted as agent in handling her estate pursuant to agency agreement, record *held*, to show it exercised proper supervision

under the circumstances, during period of depression, there
being no evidence of bad faith or wilful default; the fact
that she sustained losses being insufficient alone to establish
negligence.

15. SAME—ESTOPPEL.

Loss sustained by widow from trust company's investment of
her funds in mortgage participation certificates which it had
sponsored *held,* not chargeable to defendant in suit for account-
ing, brought after its discharge as agent, where plaintiff
acquiesced in such investment over a period of time and
accepted income therefrom.

Appeal from Wayne; Richter (Theodore J.), J.
Submitted January 4, 1938. (Docket No. 4, Cal-
endar No. 39,695.) Decided April 4, 1938.

Bill by Sarah Mellen Stephens against Detroit
Trust Company, a Michigan corporation, and Frank
D. Eaman, George R. Andrews and Alfred C. Mar-
shall, trustees, for an accounting and for reimburse-
ment for losses sustained while defendant trust com-
pany was acting as trustee of her estate and for
other relief. Cross-bill by defendants against plain-
tiff to secure the settlement of certain trustee ac-
countings and releases thereon and for other relief.
From decree, plaintiff appeals. Affirmed.

*Beaumont, Smith & Harris (Percy J. Donovan,* of
counsel), for plaintiff.

*Monaghan, Crowley, Clark & Kellogg (Frank D.
Eaman,* of counsel), for defendant.

CHANDLER, J. On January 2, 1929, plaintiff en-
tered into an agreement with the defendant Detroit
Trust Company, then known as the Detroit & Secu-
rity Trust Company, the pertinent provisions there-
of reciting as follows:

"Memorandum of an agreement, made this 2d
day of January, 1929, between Sarah Mellen

Stephens, of the City of Detroit, Wayne County, Michigan, hereinafter called 'first party,' and Detroit & Security Trust Company, a Michigan corporation, hereinafter called 'second party.'

"First party herewith delivers unto second party money, bonds, securities and other personal property which is more particularly set forth in the schedule of property hereto attached, and by these presents she hereby constitutes and appoints second party her agent in her name, place and stead (or in its own name when more convenient), to manage all such assets, as well as the proceeds of the sale or conversion thereof, the investments and reinvestments which shall be made with such proceeds, and all other money, bonds, securities and personal property acceptable to second party which she may hereafter deliver to it, to be held under authority of this instrument. * * *

"Second party shall collect all the income arising from the money, bonds, securities and other personal property, including land contracts, which may at any time be held by it under authority of this instrument, and it is hereby expressly directed and authorized to execute and deliver as full and complete receipts therefor as first party herself could give in like cases. It shall also have full power and authority to receive and receipt for all portions of the principal which shall be payable at any time hereunder for any reason. * * *

"Second party is hereby expressly authorized to retain all bonds, securities or other personal property intrusted to its management hereunder, in the form and amount specified in the schedule of property hereto attached, as well as all other bonds, securities or personal property hereafter committed to its control hereunder, being liable for loss only in case of its bad faith or wilful default; but the said second party shall have full power and authority in its discretion to invest and discount, and to change

or substitute investments whenever it shall deem a change or substitution to be for the best interests of first party, and in making investments and reinvestments hereunder, or in making substitution of investments, or whenever else, in the opinion of the second party a disposition of any securities held by it hereunder shall be necessary or proper, the said second party shall have authority to sell any corporate stock or other securities then constituting a part of the principal of this trust, at public sale or by private negotiation, on such terms, at such prices, and subject to such conditions as it shall deem best, and the second party is hereby expressly authorized to purchase bonds and other proper trust securities from Detroit & Security Trust Company at the prevailing market prices thereof; that is, at the prices at which such bonds or other securities are then being sold to its other customers. Authority is hereby expressly given to second party to assign, deliver and cause to be transferred on the books of the corporation concerned, any stock held by it under authority of this instrument.

"(a) Nevertheless, it is understood and agreed that whenever first party shall so direct in writing, the second party shall invest and reinvest available portions of the principal held by it hereunder in such manner as first party shall therein so direct, in each such instance without liability to second party with respect to any investment so made. * * *

"The title to all money, property, securities or other property at any time held hereunder, whether registered in the name of second party or otherwise, shall at all times be deemed to belong to first party. * * *

"Except as herein expressly stated to the contrary, second party shall manage all property, real or personal, and all securities which may be committed to its control hereunder as it shall deem best, without need for confirmation or approval by first

party, and second party is hereby expressly given authority to take each and every action with respect thereto which it shall deem to be for the best interests of first party, whether such action be by legal proceedings or otherwise. Every implied authority and power reasonably necessary to the full and complete exercise of the powers which are herein expressly granted, shall be deemed to be hereby expressly given to second party.

"Second party agrees that it will keep a true and correct account of all receipts and disbursements made by it under authority of this instrument, and furnish to first party quarterly statements of the same; and it further agrees that on demand it will prepare and deliver to first party a full and complete inventory of all property, real and personal, and securities or investments which shall be subject to its control hereunder. * * *

"This instrument may be revoked in its entirety or amended in any particular, by first party at her pleasure; revocation to be effective 30 days after delivery of notice thereof to second party, and amendments to be effective from the date of delivery thereof to second party."

At the time of the execution of the mentioned agreement, plaintiff was a widow of some 70 years of age, who traveled extensively, spending a considerable portion of her time in Europe and cities other than Detroit, her place of residence. She maintained an office in Detroit which was under the supervision of her bookkeeper, a Mrs. Carpenter. For some period of time prior to January 2, 1929, her affairs had been principally intrusted to her son-in-law, Mr. Julian Harris, an attorney and a director of the defendant trust company. It is claimed by plaintiff that due to the failing health of Mr. Harris, he desired to be relieved of his responsibilities in connec-

tion with the supervision and management of her estate and that, with this purpose in mind, the agreement of January 2, 1929, was consummated, and in furtherance thereof her portfolio of investments was delivered to the defendant. Included in her portfolio were common stocks, the total market value at that time being approximately $1,800,000, which sum represented a profit of some $500,000 in excess of the original purchase price of $1,294,350.01. The portfolio also included notes of the Oliver Iron Mining Company guaranteed by the U. S. Steel Corporation in the sum of $650,000, together with bonds, cash and some real estate.

Plaintiff's bill of complaint seeks to surcharge the Detroit Trust Company as *trustee* for losses sustained in her estate from the date of the agreement to its termination by plaintiff on March 23, 1933. Briefly summarized, the bill complains of losses resulting to her estate either by the failure of defendant to act when, it is alleged, action should have been taken, and of certain unauthorized action taken by the Detroit Trust Company claimed to have been made without plaintiff's knowledge and consent. She seeks to recover for losses incurred; first, by the failure of defendant to liquidate her common stocks within a reasonable time subsequent to January 2, 1929; second, by the failure of defendant to sell bank stock owned by her, and which it is claimed was ordered sold by her; third, by the purchase by defendant of common stocks for her estate at a price in excess of $300,000, said purchases alleged to have been made without her knowledge and consent; fourth, by the purchase of her estate by defendant from itself of mortgage participation certificates; and fifth, by investing her funds in certain real estate mortgages. The complaint relative to the item last

mentioned was settled in the trial court by the offer of defendant to repurchase the mortgages in question and will, therefore, not be considered in this opinion.

It has been stated that plaintiff seeks to recover from defendant as *trustee,* it being her position that by the agreement of January 2, 1929, a relationship of trustee and *cestui que trust* was created and that therefore a duty to exercise a high degree of care in the management of her estate devolved upon defendant. On the other hand, defendant interprets the relationship as a mere agency with the consequent implication of the absence of that high standard of care by which its acts would be judged were it acting as trustee rather than as agent. As agent, defendant would be bound to act in good faith (2 Am. Jur. p. 203, § 252) and exercise reasonable skill, care, diligence and judgment in acting in behalf of its principal. 2 Am. Jur. p. 221, § 276. And if defendant held itself out as especially skilled in the undertakings it assumed, which it did, it was obligated to use that degree of care and skill which would ordinarily be exercised at that time by one performing similar functions under like circumstances. 3 C. J. S. p. 38, § 160.

We will briefly sketch the conduct of the parties and various transactions occurring during the existence of the relationship as bearing upon the question as to whether an agency or a trust is involved.

On December 28, 1928, Mr. Harris, plaintiff's son-in-law, who had previously supervised the estate, and who actively participated in the drafting of the agreement between the parties and the negotiations preceding the date upon which defendant assumed management of the estate, wrote defendant relative to the securities which were then in his hands, re-

ferring to an "agreement whereby you are to act as agent for Mrs. Stephens," which language was in accord with the language of the agreement itself which characterizes the relationship as an agency by the words; "first party * * * hereby constitutes and appoints second party her agent," etc. And likewise, much of the correspondence between the parties, subsequent to the effective date of the instrument, refers to defendant as "agent," including letters written by plaintiff to defendant in which she refers to stocks "now in your hands as my agent."

On February 8, 1929, the parties executed an amendment to the original agreement, said amendment pertaining to plaintiff's real estate. The amendment consistently refers to the original agreement as an "agency agreement" and defendant as "agent." Also, on the same date, plaintiff executed to defendant a power of attorney to transfer stock and collect the proceeds of notes, checks, et cetera, which would scarcely be necessary if defendant was trustee holding title to the property as such.

Obviously, the mere reference to defendant by the use of the word "agent" and to the agreement itself by such words as "agency agreement" is not decisive that the relationship was in fact an agency, but is a circumstance entitled to consideration in disposing of the question.

Other facts, together with those already mentioned, convince us that defendant was an agent and not a trustee. The agreement provided that title to the property involved should at all times remain in Mrs. Stephens. This is inconsistent with a conception of a trust relationship which contemplates the vesting of the legal title in the trustee to be held for the benefit of those designated as beneficiaries. *Equitable Trust Co.* v. *Milton Realty Co.,* 261 Mich.

571; *Pierowich* v. *Metropolitan Life Ins. Co.,* 282 Mich. 118. The separation of the legal from the equitable estate is one of the more obvious distinctions between a trust and an agency, the trustee holding legal title, the agent having no title.

The agreement also retained a power of revocation and amendment in plaintiff. The retention of the power of revocation would not necessarily be inconsistent with a trust relationship, yet of itself is not indicative of a trust and must be considered with other circumstances upon final analysis. See *Lawrence* v. *First Nat'l Bank & Trust Co. of Kalamazoo,* 266 Mich. 199; *Goodrich* v. *City Nat'l Bank & Trust Co. of Battle Creek,* 270 Mich. 222.

In addition to those distinguishing features which we have mentioned, and contrary to the claims of plaintiff, the conduct of the parties subsequent to January 2, 1929, and throughout the balance of the period during which the relationship existed, points to defendant as an agent acting with reference to the estate upon the advice, recommendations and orders of either plaintiff or her son-in-law, Mr. Harris. The record does not exhibit the exercise by defendant of the discretion of a trustee but rather the exercise, as agent, of the will of plaintiff as principal.

"Agency is formed with the thought of constant supervision and control by the principal. Trust is based on the idea of discretion in the trustee and guidance by the settler or *cestui* only to a limited extent and when expressly provided for." (1 Bogert on Trusts and Trustees (1st Ed.), p. 50.)

Although it cannot be denied that defendant was to exercise some discretion in the discharge of its duties and was given certain discretionary powers by the agreement, yet it is apparent that its discre-

tion was not unlimited and that it was intended that its acts should be subject to the desires and control of plaintiff should she care to assert her authority.

We will refer to a few of the instances which indicate defendant to be acting as agent. On February 8, 1929, plaintiff ordered defendant to purchase "Wilcox & Rich 'A' stock" and at the same time directed the stock to be sold when the market price had reached a certain designated point. By letter of February 11, 1929, she ordered defendant to buy "General Spring Bumper Company stock" to be sold as directed by her son-in-law. On March 3, 1929, she cabled defendant to sell all her Packard stock if the market reached 170, and also gave orders relative to the sale of "Wilcox-Rich Co." On August 15, 1930, Mrs. Carpenter, plaintiff's bookkeeper, wrote defendant,

"Mrs. Stephens further asks that any of her stocks will not be sold or in any way disposed of without first consulting her, if she is in the country, or Mr. Julian H. Harris."

In reply thereto, defendant stated:

"No stocks ever have been sold in this account or ever will be sold without the written authority of either Mrs. Stephens or Julian H. Harris."

We have made no attempt to relate in their entirety all transactions between the parties but have selected the foregoing as illustrative of the entire record as it sets forth the conduct of the parties indicating that defendant was acting as agent.

To recapitulate, we hold that an agency was created; because it was so designated by the parties; because title to the property was at all times vested in plaintiff; because of the retention by plaintiff of the power of revocation and amendment; and, be-

cause the conduct of the parties definitely establishes the relationship was treated as an agency and intended as such by them.

The agreement provided that defendant should be liable for "loss only in case of its bad faith or wilful default." Plaintiff claims this provision to be void as contrary to public policy, her argument presupposing that defendant was acting as trustee rather than as agent. We express no opinion as to the effect of such a provision as pertaining to a trust, but hold that the same as applied to this agency is valid.

As to the alleged failure of defendant to sell the common stocks placed in its custody, plaintiff contends that it was defendant's duty to sell the same and that instructions were given to do so at the inception of the agency. Mr. Spicer, chief trust officer of defendant, with whom the agreement was negotiated, denied that instructions to sell were given. The claim of a general order to sell all of her stocks is inconsistent with facts such as subsequent orders by plaintiff to purchase certain stocks and to retain others until the market reached a certain point. Plaintiff was also mailed by defendant an analysis of her list of securities under date of March 29, 1929, in which it was recommended that certain issues be sold. She denies receiving the analysis, yet on May 4, 1929, her bookkeeper wrote defendant upon orders of plaintiff to purchase all U. S. Steel rights to which plaintiff was entitled and quoted plaintiff as follows:

"She writes further, 'As you know I am willing, when the best time presents itself, to sell all stocks not desirable to keep. I mean stocks you and I have discussed like Wilson, Lee Tire.' Mrs. Stephens would like that I be informed just what is done in regard to the purchase of U. S. Steel stock, so that I may be able to inform her."

Also, as late as February 16, 1932, plaintiff modified the agreement by a letter to defendant providing—"That hereafter no investments shall be made in this trust, or sale of securities or property therefrom, without the prior written approval of Sarah M. Stephens, or of Julian H. Harris in her behalf." At this time it is apparent that her securities were discussed with the officers of the defendant company and no complaint as to retention of the common stocks in her account was made.

We find that plaintiff has failed to sustain the burden of proof in regard to her claim of a general order to sell all her common stocks, it being expressly denied by defendant that such an order was given and the record revealing not only that plaintiff herself ordered certain stocks to be bought, sold, or retained, but that she had knowledge at all times, or should have known from statements furnished, that the securities in question had not been sold and yet no complaint was made.

She next complains of the failure to sell her bank stocks, alleging defendant to have been given express instructions so to do. She testified that she was advised to sell the bank stocks by Mr. Harris upon her return from Europe on October 15, 1929, and that although she promptly refused with the statement, "Why that is * * * impossible because that is my nest egg," she became convinced of the advisability of selling and told Mr. Harris to instruct defendant to sell. She further claims that the order to sell was communicated to Mr. Stone, an executive officer and chairman of the board of the defendant company. Mr. Stone denied that he ever received orders that the bank stock was to be sold. We believe that plaintiff failed to meet the burden of proof on this point upon examination of all the testimony. Not only was her testimony denied by

Mr. Stone, but on October 21, 1929, defendant wrote plaintiff as to the possible advisability of selling a portion of her stock in the Detroit & Security Trust Company to cover an overdraft, and apparently no reply was made by plaintiff to this letter. Furthermore, at the meeting of February 16, 1932, all the assets in the account, including bank stock, were before the parties for discussion, and as far as the record reveals no complaint was at this time made of their presence in the account. It also appears that the quarterly statements rendered by the defendant listed the bank stocks and plaintiff must have known from these of their presence and yet apparently made no complaint. We hold that she failed to sustain the burden of proof on this issue.

As to her claim that common stocks were purchased by defendant in the sum of some $300,000 without her knowledge and authority and contrary to her desires, the testimony of plaintiff again conflicts with that of defendant. We conclude, however, from an examination of the entire record, and find as a matter of fact, that the great majority of purchases of common stocks made by the defendant were made either upon the order of plaintiff or Mr. Harris, and that those which might have not been so purchased, must have been known to her from the various statements rendered in which all stocks were listed, and from conferences in which they were discussed. Having knowledge, and making no protest, she cannot now complain of those purchases, if any, that were made not upon her express direction. Furthermore, the agreement itself conferred upon defendant "power and authority in its discretion to invest and discount, and to change or substitute investments whenever it shall deem a change or substitution to be for the best interests of first party." It

might well be said that in making the purchases, defendant was exercising a power expressly granted to it by the terms of the agency agreement. The stocks purchased were common stocks of corporations generally considered to be sound financially at the time and were comparable to the type of stocks owned by plaintiff and turned over to defendant at the inception of the agency. Under the terms of the agreement and surrounding circumstances, we must hold the purchases made to have been proper and an exercise of good faith and sound investment judgment by defendant as agent.

The case presents the question as to the care of defendant generally and it is suggested that it was its duty to sell stocks so as to have avoided losses to plaintiff without waiting for orders to sell from her. On this question there is much testimony as to the decline of the securities market during the period the agreement was in effect and the well-known financial collapse which need not be related here. It is claimed that this account did not receive proper supervision and management and had the stocks been sold at the proper time, plaintiff would not have sustained her losses. Complaint is made in particular of defendant's action in exchanging her bank stock for stock of the Detroit Bankers Company and failure to sell the latter, it being asserted that defendant had special information that the stock was not a sound investment. It should be parenthetically added that the exchange of bank stock was made with the knowledge of Mr. Harris, who was a director of the defendant company and as such voted in favor of the exchange.

A review of the entire record impresses us that defendant did exercise proper supervision of the estate. Bearing in mind the chaotic business condi-

tions prevailing, it must be held that defendant acted in good faith and exercised ordinary prudence, skill, and care in discharge of its duties under the circumstances. The testimony shows periodic review of the securities in the estate and that the conduct of defendant in regard thereto was in accord with the most authoritative opinion then available as to economic trends and prospects. The record demonstrates an exercise of honest judgment on the part of defendant and a judgment in accord with the prevailing opinion as to management of a portfolio similar to that belonging to plaintiff. The mere fact that plaintiff sustained losses does not of itself establish that defendant was derelict in the discharge of its duties. Likewise, there is no evidence of bad faith or wilful default. We hold, therefore, that defendant did discharge its duty generally devolving upon it by assuming to act as agent under the agreement.

The final contention relates to the investment of plaintiff's funds in mortgage participation certificates upon which she sustained a loss in excess of $17,000. The participation certificates were sponsored by defendant and the latter claims they were sold by it to plaintiff's account at cost and further that it sustained a loss in connection with the enterprise after taking into consideration the cost of servicing the mortgages, et cetera. We express no opinion as to whether mortgage participation certificates were a proper investment to make under the circumstances, but dispose of the issue by holding that because plaintiff had knowledge, or should have known, that the investment had been made, which knowledge is apparent from her use of the income therefrom, from the quarterly statements from defendant showing their presence in her account, and

from the fact that they were entered on plaintiff's books in her office, and having such knowledge and making no complaint, that she has acquiesced in the investment and cannot attack the same at this time.

The decree is affirmed, with costs to appellees.

WIEST, C. J., and BUSHNELL, SHARPE, POTTER, NORTH, and McALLISTER, JJ., concurred. BUTZEL, J., did not sit.