MARION TYLER O'CONNOR, APPELLANT, v. BURNS, POTTER & COMPANY ET AL., APPELLEES.

36 N. W. 2d 507

Filed March 18, 1949. No. 32244.

*William Ritchie*, for appellant.

*Kennedy, Holland, DeLacy & Svoboda*, for appellees.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

CARTER, J.

This is a suit for an accounting of the acts and doings of the defendants in relation to the cash and securities delivered to them under an agreement and understanding between plaintiff and the defendants, and for a judgment for losses suffered by the plaintiff resulting from violation of the agreement and the duties and obligations owing to the plaintiff by the defendants growing out of the relationship created by such understanding and agreement, and inhering therein. The trial court found for the defendants and the plaintiff appeals.

The evidence shows that Burns, Potter & Company was a partnership prior to January 1, 1932, composed of Arthur C. Potter, Plummer P. Purdham, and Cedric Potter, which partnership continued in existence until the death of Cedric Potter in 1939. On January 1, 1932, Burns, Potter & Company was incorporated under the laws of Nebraska for the purpose of taking over all the assets and assuming all the liabilities of the partnership. Such transfer of assets and assumption of liability was perfected and the liability of the corporation for the obligations of the partnership is not in issue here. Defendants Arthur C. Potter and Plummer P. Purdham, the sole surviving members of the partnership, are and have been since January 1, 1932, the managing officers of the corporation. Both the partnership and the cor-

poration carried on a stock and bond business in Omaha and the latter is presently engaged in said business.

The plaintiff, prior to 1930, had engaged in the buying and selling of stocks and bonds as a matter of investment and reinvestment of assets inherited from her father. Plaintiff claims that she reposed great trust and confidence in the ability and integrity of. Arthur C. Potter and made investments including the purchase and sale of stocks and bonds on the advice and at the suggestion of Potter. Because of this relationship she says she transacted all of her investment business since 1927 with Burns, Potter & Company.

On February 13, 1930, plaintiff turned over to Burns, Potter & Company all her securities and cash to be held by it for investment and reinvestment in accordance with the best judgment of said Burns, Potter & Company with the further understanding that the remuneration should be $1.00 per $1,000 face value per annum for such securities as were held by the defendant in addition to the usual profit in buying or selling securities from and to customers. Such understanding is evidenced by a certain letter-agreement which will be discussed in detail in a subsequent portion of the opinion.

Plaintiff asserts that she turned over to Burns, Potter & Company, pursuant to the aforesaid agreement, between February 13, 1930 and January 1, 1932, securities and cash of the value of $79,722.80. She alleges also that from January 1, 1932 to November 30, 1939, securities and cash delivered to or collected for her by Burns, Potter & Company amounted to $24,867.27. Interest and dividends collected on certain mortgages and on sold securities during this period amounted to $5,858.35. A tax refund of $184.37 is alleged to have been collected. Plaintiff claims that a fair, reasonable, and proper return to plaintiff from a proper investment of these funds is 3½ percent per annum and that such earnings, so calculated, amount to $29,761.82. The total amount

for which plaintiff claims that the defendants should account amounts to $140,394.61.

It is the contention of plaintiff that the defendant Burns, Potter & Company accepted and held plaintiff's funds and securities in trust and that the duties and obligations of Burns, Potter & Company to the plaintiff were those of a trustee; that Burns, Potter & Company handled said funds and securities from February 13, 1930 to November 30, 1939, without informing plaintiff in detail as to their condition; that the company concealed the fact that most purchases and sales resulted in a substantial loss; that they invested in stocks and bonds which were highly speculative and not true investments; that sales were made too frequently and the reinvestments were therefore made too often in view of the financial resources of the plaintiff; and that many of such sales were apparently made for the benefit of the company, evidently to assist the company to sell its own securities to avoid loss to itself, or those of other customers, or those in which the company or its officers were personally interested. It is further asserted that the company purchased securities for plaintiff which were palpably unsafe in the face of a steadily declining market, that they were held for an unreasonable length of time, and that large unwarranted losses resulted. It is claimed that the company failed to properly diversify the investments and spread the risk. It is claimed also that the company sold to plaintiff from its own portfolio at profits which were excessive in view of the character of the securities. Negligence and fraud are asserted in the handling of certain specified investments.

Plaintiff admits the following credits: Payments paid to plaintiff from her account for living expenses, $47,719.23; amount invested in Union Pacific Railroad stock at plaintiff's specific direction, $24,311.34; a total of $72,030.57. Plaintiff admits that interest and other cash items in the amount of $1,361.15 have been de-

livered to her since the agreement was canceled, leaving a balance due of $67,002.89, and for which amount she prays judgment.

In answer to the foregoing the defendants allege that on or about February 14, 1930, plaintiff and defendants entered into an agreement whereby Burns, Potter & Company would act as manager for such funds and securities as plaintiff would deliver to them for safe-keeping, and invest and reinvest the same according to their best judgment as provided in the letter-agreement of February 14, 1930. Defendants deny any confidential or fiduciary relationship between the parties at any time. They contend it was agreed that defendants would in no way be responsible for the safety of the funds invested, that the risk was plaintiff's, and that the purpose of the arrangement was to relieve the plaintiff of the inconvenience of handling her own investment affairs. Defendants deny the existence of a trust relationship or that one was intended. Defendants deny that any of the transactions were concealed and allege that a typewritten confirmation of each transaction was sent to the plaintiff and that through conversations, consultations and other means, plaintiff at all times knew of the condition of her account. Defendants admit selling securities to plaintiff on occasion at a rate higher than the cost to them, but allege they never sold to plaintiff at a price higher than the market price on the day in question, nor did they ever take a profit in excess of the normal and usual profit as agreed to in the letter-agreement. Defendants allege that the losses sustained were the result of a steadily declining market in the depression years from 1929 to 1938 when all investments suffered heavy market shrinkages. Defendants claim that plaintiff had full knowledge of the losses taken and at various times advised with defendants regarding additional purchases to recoup losses taken. Defendants allege that plaintiff took credit for all losses in her annual income tax returns to the federal govern-

ment and never complained or demanded an accounting until 1938. Defendants allege that plaintiff has been given access to their records and, under the circumstances shown, defendants can give no different accounting than that to which plaintiff has been given access.

It will be readily observed that the nature of the agreement made by the parties, under which the plaintiff turned over and the defendants accepted the securities and funds of the plaintiff, is of the utmost importance in determining the rights of the parties. We think the situation of the parties and the circumstances surrounding them prior to and at the time of the execution of the letter-agreement of February 14, 1930, becomes important in determining the intentions of the parties. We make no distinctions between the oral agreement of February 13, 1930, and the letter-agreement of February 14, 1930, for the reason the evidence shows them to be identical insofar as their relation to this litigation is concerned.

The evidence shows that Burns, Potter & Company was an investment dealer. It purchased securities on its own account for resale to the purchasing public. The profits of the company consisted of the difference in the buying and selling price of such securities and the volume of turnover it was able to obtain. The company carried on a limited brokerage business in that it would handle orders for its customers on the New York Stock Exchange, adding a loading charge for its service to the customer in addition to the regular commission charged by the New York Stock Exchange. In other words it was an over-the-counter dealer in securities much the same as a retailer of merchandise. The company was not a member of any stock exchange with listed securities. It did participate frequently in syndicate agreements with other dealers by which the syndicate obtained blocks of securities or even a whole issue in accordance with the subscriptions of the participating members of the syndicate. This was accomplished

either by outright purchase by the syndicate or by selling agreements made by the syndicate with the corporation owning or issuing the securities. The profit from these transactions was usually fixed by the syndicate and was determined by the kind and character of the security and the financial standing of the issuer. The corporation did not carry on a general brokerage business and it was not authorized to act as trustee. This, then, was the type of institution with which plaintiff was dealing during the times herein mentioned.

The record shows that C. R. Tyler, the father of the plaintiff, had been a successful flour miller in Council Bluffs, Iowa. He had accumulated three farms in Iowa, some city residences, and had invested substantial sums of money in stocks and bonds. The record shows both by the evidence of witnesses and the type of securities in which he invested, that he demanded securities returning a high yield to the holder. Plaintiff was an only child and the sole heir of C. R. Tyler. Before his death he turned over his stocks and bonds to the plaintiff. There is evidence in the record that plaintiff accompanied her father to the office of Burns, Potter & Company on several occasions and sat in on the discussions held by her father and the defendant Potter. In the summer of 1928 plaintiff began handling the securities of her father. They were all transferred to plaintiff prior to the death of the father in 1933 and handled by her from and after 1928.

Plaintiff asserts that she relied upon the advice of A. C. Potter because of a close relationship between him and plaintiff's family. The evidence shows in this respect that plaintiff's mother and the mother of Potter had attended the same girls school and had had some association throughout the years. The record does not show that plaintiff and Potter were particularly close except for the business relationship which existed. It will be noted also in this respect that plaintiff followed in

the footsteps of her father 'in dealing with Potter, and with Burns, Potter & Company.

When Tyler placed the stocks and bonds in his portfolio in the care of the plaintiff, practically all of them were high-yielding securities. They were of the type in which safety of investment had been sacrificed to some extent for a high return. We do not infer from this statement that they were not sound or wise investments, but merely that they did not represent the type of investment in which security and safety were the primary consideration. Among the securities turned over to the plaintiff were numerous foreign bonds, local bonds and stocks bearing high rates of return, and industrial stocks not highly rated in financial circles. The number and amount of foreign bonds were particularly noticeable.

The record shows that plaintiff continued to advise with Potter and followed his recommendations to a great extent. This, Potter admits. But Potter asserts that during this period plaintiff made the final decisions and acted entirely on her own. The plaintiff does not contend otherwise until after the letter of agreement of February 14, 1930.

Commencing in August 1928, and continuing until the execution of the letter-agreement of February 14, 1930, plaintiff bought and sold stocks and bonds from and to Burns, Potter & Company. She advised with Potter before making most of these transactions. The securities purchased were generally of the same character as those which her father had previously purchased. There was, however, a class of securities in which she invested that deviated from the general pattern of her purchases. They are listed in the record as Incorporated Investors, Incorporated Equities, and Second Incorporated Equities. Due to the part these three stocks play in this litigation before and after the letter-agreement of February 14, 1930, we deem it advisable to discuss their general nature.

The evidence is that investments in common stocks became very popular in the 1920's. The general demand for common stocks brought about the creation of investment trusts. The assets of an investment trust ordinarily consisted of a number of high grade common stocks. The stock of the investment trust represented, therefore, a corresponding interest in the group of common stocks held by the investment trust corporation. Insofar as the type of investment trust involved in the present litigation was concerned, the common stocks held consisted of high grade industrial, rail, and utility stocks. Various types of investment trusts sprang up. The fixed trust was one where the common stocks to be purchased by it were fixed in advance and were not subject to change during the life of the investment trust corporation. The second type was known as the management type investment trust in which the stocks to be purchased and held by it were left to the judgment of the managerial officers of the investment trust corporation. The latter type could be open-end or closed as the corporation chose. The stocks here involved designated as Incorporated Investors, Incorporated Equities, and Second Incorporated Equities fell within the classification of open-end investment trusts.

The evidence shows that Burns, Potter & Company in 1928 investigated the nature and reliability of Incorporated Investors, including the common stocks held by it, its earning statements, and the statements and the personnel charged with its management. As a result of these investigations, Burns, Potter & Company concluded to sell Incorporated Investors stock to customers desiring this type of investment. The testimony shows that plaintiff purchased 50 shares of Incorporated Investors stock at 76½ on September 5, 1928, after a full and complete discussion with Potter as to their nature, safety, and yield. She had full knowledge of the structure of the Incorporated Investors corporation, the list of the primary investment stocks which it held, the

record of earnings, and the financial statements of this company. On October 3, 1928, plaintiff purchased 70 shares of Incorporated Equities. This latter corporation was organized for the purpose of purchasing and holding the stock of Incorporated Investors only. The plan of this corporation was to purchase Incorporated Investors stock, borrow approximately 50 percent of its capital investment on the Incorporated Investors stock already purchased and invest the money thus borrowed in additional Incorporated Investors stock. The evidence of Potter is that he advised plaintiff fully regarding this stock and that she herself determined to make the purchase. The record discloses that on November ·20, 1928, 30 shares of Incorporated Equities were purchased by plaintiff; on January 23, 1929, or shortly prior thereto, plaintiff purchased 100 shares of Incorporated Equities and 11 shares of Incorporated Investors; and on July 3, 1929, she purchased 125 shares of Second Equities. On November 19, 1929, 2 shares of Incorporated Investors were purchased. On December 20, 1929, plaintiff purchased 275 shares of Incorporated Investors. In early January 1929, plaintiff purchased 625 shares of Second Incorporated Equities direct from the issuing company.

The record discloses that as a result of the great demand for Incorporated Investors and Incorporated Equities stocks which could not be supplied, the stock known in this record as Second Incorporated Equities was placed on the market. It was similar to Incorporated Equities in that its investment was in Incorporated Investors stock exclusively. Instead of being a borrowing company for the purpose of increasing its investment in Incorporated Investors stock, it accomplished the same end by issuing a collateral trust bond issue in which its Incorporated Investors stock was used as collateral. The stock of Incorporated Equities and Second Incorporated Equities was, consequently, very similar in all respects. Plaintiff therefore held Incorporated Investors, Incorporated Equities, and Second Incorporated Equities stocks,

in addition to various stocks and bonds of the nature heretofore described, when the agreement of February 14, 1930, was made.

The evidence is that the purchase of the 275 shares of Incorporated Investors stock on December 20, 1929, was an attempt to recoup losses accruing as a result of the stock market crash which reached its peak on November 13, 1929. On that date Incorporated Investors dropped to 41½. On November 19, 1929, it had gained strength and was then worth 50. After a complete discussion of the situation with Potter, plaintiff sold sufficient foreign bonds to buy the 275 shares of Incorporated Investors. In late 1929, Second Incorporated Equities came out with a plan to sell additional stock to existing stockholders at $5 a share, limited to 5 shares for each share previously held. After a complete discussion of the matter with Potter, plaintiff purchased 625 shares direct from the issuing corporation. This was clearly a recoupment move on the part of the issuing corporation as well as on the part of the plaintiff herself. The assertions of bad faith and negligence in the handling of other stocks and bonds are no different than in the handling of the investment trust stocks.

The industrial, rail, and utility stocks held by plaintiff suffered materially in the stock market crash. Uncertainty was everywhere in the financial field. Defendant Potter testifies that, after the stock market crash had reached its peak on November 13, 1929, there was a general feeling that the worst was over and that the moderate increases in stock market prices which followed indicated this fact. Numerous financial journals and opinions of recognized experts appearing in the record sustain this view. Plaintiff was advised of these facts by Potter before the recoupment purchases were made.

The record shows that plaintiff was fully aware of the financial danger in which she found herself. She made many trips to the offices of Burns, Potter & Company during the four-month period preceding the agree-

ment of February 14, 1930, not only to advise with them but to deliver stocks and bonds which had been sold and to receipt for those which had been purchased. The matter of eliminating the inconvenience of these trips to the office of Burns, Potter & Company and to and from her own safety-deposit box was discussed several times with the defendant Potter before an agreement was finally decided upon. This, then, was the situation existing between the parties when the letter-agreement of February 14, 1930, was made.

On February 14, 1930, Potter caused a letter, addressed to Burns, Potter & Company, to be prepared for signature by the plaintiff. It provides as follows:

"With reference to my securities and funds which you are holding for safe-keeping for me, it is my understanding that you will act as manager for such funds and securities. You will invest or reinvest the funds from time to time and buy, sell or exchange any of my securities at such times and prices as your best judgment may dictate.

"Your remuneration shall be as follows: $1.00 per $1,000.00 face value per annum for such securities of mine as you may be holding. You will receive no other remuneration, other than the usual profit which you may have in the securities which you sell me, or sell for me.

"I understand that you are in no way responsible for the safety of the funds invested, and that the risk is mine, the purpose of this arrangement being to relieve me of the inconvenience of handling my own investment affairs.

"This agreement is subject to cancellation by either party on thirty-days notice."

The foregoing letter was signed by plaintiff and accepted in writing by Burns, Potter & Company. Plaintiff testifies that she signed it in the office of Burns, Potter & Company at the time it was first presented to her. Potter says that she took the letter with her and that it was mailed to Burns, Potter & Company on March

10, 1930, after she had been requested by mail to return it. This testimony is corroborated by the receiving date stamped on the letter and the evidence of the employee who wrote the letter requesting the return of the letter-agreement. We think the evidence preponderates in favor of the defendants on this issue. We find, therefore, that plaintiff had the letter-agreement in her possession almost a month before she signed and returned it to Burns, Potter & Company. The agreement was canceled pursuant to its terms on December 1, 1939.

Upon the execution of this letter-agreement plaintiff turned over all of her securities to Burns, Potter & Company, the character of which has been previously referred to. In addition thereto the plaintiff paid $28,817.80 to Burns, Potter & Company for a group of preferred stocks which she had purchased on February 5, 1930. This was new money derived from the sale of a farm. These preferred stocks were also left with Burns, Potter & Company under the terms of the letter-agreement.

The evidence shows a continued course of dealing which was very similar to that which had taken place before the letter-agreement was made. It is the contention of Potter that he continued to act only on the advice of the plaintiff just as in previous times except that it was often done by telephone or letter. The securities were all held by Burns, Potter & Company in such form that plaintiff was not required to endorse them. The necessity for plaintiff to bring in the securities as they were sold, to affix her endorsement thereon, and to receipt for new securities purchased, was eliminated by the new method of handling. Defendants contend that this was all that was intended to be accomplished by the agreement. Plaintiff contends otherwise, and this poses the primary issue in the case. The record shows also that the keeping of records became burdensome to the plaintiff and the necessity of making continuous settlements after each sale or purchase caused her great

inconvenience. This resulted in a further arrangement on or about May 1, 1930, whereby Burns, Potter & Company opened a ledger account with plaintiff. Thereafter all sales and purchases were credited or debited to the account of the plaintiff. In accordance with this understanding, Burns, Potter & Company placed such amounts as she needed in plaintiff's bank account for her living expenses. No dispute arises concerning the amounts thus paid by Burns, Potter & Company. It is only as it bears upon the whole situation that it is of any importance here. Potter contends that confirmations of sales and purchases of plaintiff's securities were regularly mailed to the plaintiff. Copies of these confirmations are in the record, addressed to the various places at which plaintiff resided during this period. Plaintiff admits receiving some of these confirmations and denies receiving those, generally speaking, from February 14, 1930 until 1938. Plaintiff denies that she knew anything about all these transactions and that they were handled solely by Burns, Potter & Company. There are in evidence, however, the annual income tax returns signed by the plaintiff. Attached to each is a detailed list of losses sustained on stock and bond investments. This situation continued during the depression years in the early 1930's. It was common knowledge that stocks and bonds, as well as everything else, had slipped materially in value. Notwithstanding her knowledge of this type of investment, and we think the record shows she had considerable, she voiced no complaint, and made no attempt to cancel the agreement made. It is evident from this record that plaintiff desired to deal in second grade securities in order to obtain a higher yield on her investments. The investments made after the letter-agreement follow the same pattern as those made previously by plaintiff and her father. The stock and bond markets were up and down, but over the period here involved it was definitely a declining market. High grade securities suffered along with those of lesser financial ratings. The market was

very uncertain and the opinions of financial experts showed great divergence. Plaintiff suffered large losses in her investments as did all heavy investors. High-yield investments dropped in value in greater proportion than the higher grade securities returning a lesser yield, a result that is to be expected and generally known. It is for losses thus sustained which plaintiff claims should have been guarded against by Burns, Potter & Company under the agreement which she made.

Plaintiff contends that the agreement created a trust relationship with Burns, Potter & Company as trustee. A trust, when not qualified by the word "charitable," "resulting," or "constructive," is a fiduciary relationship with respect to property, subjecting the person by whom the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it. Restatement, Trusts, § 2, p. 6; Parker v. Bourke, 131 Neb. 617, 269 N. W. 102. "The manifestation of intention of the settlor is the external expression of his intention as distinguished from his undisclosed intention." Restatement, Trusts, comment a, § 4, p. 16. In view of the situation that existed on February 13, 1930, we are called upon to determine if its effect was to create an express trust.

This record shows a course of dealing prior to February 14, 1930, between a dealer in stocks and bonds and a customer. Plaintiff purchased and sold securities at the market price in accordance with decisions which she herself made. It is true that she advised with Potter and that she had great confidence in him as an adviser in this field. No fiduciary relationship existed although the evidence does show the existence of a confidential relation between plaintiff and Potter. Plaintiff, however, made the final decision and assumed full responsibility for resulting profits or losses. Potter charged no fee for this advisory service. His sole interest was any profit Burns, Potter & Company might make in making an

over-the-counter sale at the established market price. But, as we have heretofore recited, plaintiff's operations during this period required her to make numerous trips to the offices of Burns, Potter & Company to consummate sales or purchases, the obtaining of securities sold from her safety-deposit box and the return of those purchased thereto, including the receipting for securities purchased and the endorsing of those sold. Financial adjustments had to be made after each transaction. All this drew heavily upon the time of the plaintiff and caused her great inconvenience. It was this, as the record shows, that led up to the letter-agreement of February 14, 1930, and not any dissatisfaction with the conduct of her investment business. We think the evidence shows that the purpose of the letter-agreement was to avoid this inconvenience by moving her securities from her safety-deposit box to the more convenient custody of Burns, Potter & Company. Her securities were endorsed in street form or carried in the name of Potter for short periods to eliminate the inconvenience she had theretofore experienced in this respect. It was her thought, as we think the evidence discloses, that as she was relying on the experience and training of Potter in the handling of her investments that she might as well fix it so as to eliminate all the inconvenience which appeared useless to her under the circumstances. There is nothing in the record to indicate that she intended in any way to change the nature of her investments or the legal status of Potter from that which it had been before. She talked with Potter about her investments; she received summaries of purchases and sales made in her behalf; and annually signed income tax returns, which revealed her annual profit and loss, without any complaint being made. The letter-agreement indicates, we think, an intention to permit Potter to exercise his own judgment instead of her acting upon his advice. This is supported by the terms of the letter-agreement which provided that Burns, Potter & Company were in no way responsible

"for the safety of the funds invested, and that the risk is mine." The remuneration provided as a safekeeping charge was one dollar per thousand dollars of securities, a modest charge from which a trust relation and its consequent responsibility and liability could not be inferred. Burns, Potter & Company were to receive any profit accruing to them from the sale of securities to plaintiff at the established market price, this being the same arrangement which had existed previous to the execution of the agreement of February 14, 1930. We conclude therefore that there is no external expression of intent on the part of the plaintiff to establish a trust at the time the agreement was made.

The appellant contends, however, that a trust relationship is established by the interpretation which the parties subsequently gave to the agreement. In this respect the record shows that the receipt for the securities delivered into the hands of Burns, Potter & Company the day after the agreement was made contained the words "to be held in trust." In setting up the account on the books it was denominated an "H I T" account, meaning "held in trust" account. The term "held in trust" appears incidentally a few additional places in the evidence. The use of this expression is explained in the record. The evidence is that any securities left by any customer for safekeeping was listed on their books as an "H I T" account. This was done solely to separate it from the inventory of Burns, Potter & Company. The expression was not used in its legal sense but purely as a matter of identifying the securities as belonging to the designated party rather than Burns, Potter & Company. The use of the term "trust" is not necessary to the creation of a trust and the use of the word "trust" does not always create the legal relation of trustee and beneficiary, although it is a circumstance to be considered in determining whether or not such a relation was in fact created. The explanation offered is not successfully refuted by the record. Waters v. Phelps, 81 Neb. 674, 116 N. W. 783; Price v. Treat, 29

Neb. 536, 45 N. W. 790. The use of the term "H I T" was discovered by plaintiff only after the preparations for this litigation were going forward. It is nothing, therefore, which in any way misled the plaintiff. We hold after a review of all the facts and circumstances disclosed by the record that the use of the expression "held in trust" and the symbol "H I T" did not of themselves evidence the establishment of a trust relationship. Parker v. Bourke, *supra*.

The use of the words "for safe-keeping" and "investment" in the letter-agreement is not a controlling factor in determining whether Burns, Potter & Company was a trustee or an agent. It is a circumstance, however, to be considered with all the evidence in the case. The agreement before us makes no reference to a trust, a trustee, or a trust fund. The use of such terms is not necessary to the creation of a trust if facts exist which establish that a trust actually existed. Simon v. Simon, 141 Neb. 839, 5 N. W. 2d 140. But where, as here, the written portion of the agreement designates one as "manager" of funds and securities, it will not be held to be a trust in the absence of further evidence that a trust relationship was intended. Standing alone it is insufficient. The fact that a written provision of the agreement provided that it was "subject to cancellation by either party on thirty-days notice" does not negative the existence of either the trust or agency relationship. Restatement, Trusts, comment d, § 334, p. 1013. On the other hand, it is consistent with a principal and agent relationship and is a circumstance which may be considered. To a similar effect is the use of the words "you will act as manager for such funds and securities," although standing alone it tends to support a principal and agent relation.

When all the provisions of the agreement before us are considered, we think it is a managerial contract which creates a principal and agent relationship. The written portion indicates that the title to the securities was to

remain in the plaintiff by the use of the words "my securities and funds which you are holding for safe-keeping for me" and "you will act as manager for such funds and securities." It provides that Burns, Potter & Company will "invest or re-invest the funds from time to time and buy, sell or exchange any of my securities at such times and prices as your best judgment may dictate," a provision as consistent with a principal and agent relationship as with that of a trust. The clause in the letter-agreement that "I understand that you are in no way responsible for the safety of the funds invested, and that the risk is mine," conflicts with the trust theory and tends to support the theory of principal and agent although it is not conclusive. The exculpatory effect of the foregoing language will not be discussed. Under the findings made it is not important. The stated purpose of the agreement that "the purpose of this agreement being to relieve me of the inconvenience of handling my own investment affairs," clearly points to the principal and agent relation. That plaintiff felt she had control of the securities placed in the possession of Burns, Potter & Company is evidenced by the fact that she directed the sale of all her bonds and securities in the hands of Burns, Potter & Company before the termination of the agreement pursuant to its terms and directed their reinvestment in Union Pacific Railroad stock. While stocks were taken in the name of Potter, it was solely for the purpose of immediately placing them in street form by his endorsement. The evidence does not indicate that it was done to vest the legal title in him but rather to relieve plaintiff of inconvenience. There is no oral evidence nor does the letter-agreement contain any words indicating a transfer of the legal title to plaintiff's securities to Burns, Potter & Company. Ordinarily, this is essential to the creation of an express trust, although particular words are not necessary to establish it. An analysis of the agreement and all the facts and circumstances surrounding it convince us that Burns, Potter & Company was a

managerial agent and not a trustee of the securities placed in their possession. Stephens v. Detroit Trust Company, 284 Mich. 149, 278 N. W. 799; DeMott v. National Bank of New Jersey, 118 N. J. Eq. 396, 179 A. 470.

"Agency is formed with the thought of constant supervision and control by the principal. Trust is based on the idea of discretion in the trustee and guidance by the settlor or cestui only to a limited extent and when expressly provided for." 1 Bogert, Trusts and Trustees, § 15, p. 50.

The high degree of care required of a trustee cannot properly be required of Burns, Potter & Company while acting as a managerial agent. As agent it would be required to act in good faith and exercise reasonable skill, care, diligence, and judgment in acting for its principal. And where, as here, the agent held itself out as specially skilled in the undertakings it assumed, it was obligated to use that degree of care and skill which would ordinarily be exercised at that time by one performing similar functions under like circumstances. 3 C. J. S., Agency, § 160, p. 38. The conduct of the parties and the transactions had during the life of the principal and agent relationship is important in determining whether the defendants defaulted in their duties under the foregoing rules.

We have previously described the type of securities in which plaintiff invested when she handled it herself. The record discloses that Burns, Potter & Company invested her money in the same types of stocks and bonds. She had purchased foreign securities and so did the company. She had purchased second grade common and preferred stocks and so did the company. She had purchased local bonds and so did the company. She had purchased investment trust stocks and so did the company. In the absence of specific instructions to change the nature of the investments and where the agent acted in good faith upon the information that it could obtain, the agent cannot be held for losses sus-

tained under an agreement such as we have here. We find nothing in the evidence to sustain a finding of bad faith on the part of the agent.

It is urged, particularly, that liability arose out of the purchase of stock of Incorporated Investors, Incorporated Equities, and Second Incorporated Equities. The primary corporation was Incorporated Investors, an open-end investment trust company. While we think the information available justified the action of Burns, Potter & Company in purchasing these stocks in view of a lack of instructions to the contrary and plaintiff's previous attitude in respect to them, without subjecting it to the charge of negligence or bad faith, there is another reason that leads to the same conclusion. The ultimate control of plaintiff's securities was in the plaintiff. When plaintiff desired to control the sale or purchase of her securities she did so.

In May 1938, arrangements had been completed to sell 400 shares of Broad Street stock and to purchase 400 shares of Century Shares Trust. Plaintiff canceled this transaction and directed that the funds derived from the sale of Broad Street stock be used in the purchase of Union Pacific common stock. In fact, the record shows that plaintiff in April of 1938 ordered the sale of all the securities she then held and directed their reinvestment in Union Pacific common stock. The instructions were complied with. This occurrence was more than 18 months prior to the cancellation of the agreement of February 14, 1930. The orders and directions of the plaintiff and compliance on the part of Burns, Potter & Company evidences the principal and agent relationship. It is incompatible with the existence of a trust. It evidences, further, that plaintiff acquiesced in the type of investments previously made when she failed to give counter instructions to her agent as she did in April 1938. What we have said with relation to the selection of securities by the agent applies as well to the diversification of her investment. The pattern established by

plaintiff's father and plaintiff herself was generally followed. The balance between common and preferred stocks, foreign and domestic bonds and stocks, and between bonds and stocks generally, shifted materially from time to time. Diversification of investments did not appear important to the plaintiff either before or after the agreement of February 14, 1930. Although plaintiff had the ultimate control of these securities, she voiced no complaint about the diversification of investments until the agreement was canceled and preparations for this litigation were under way. Economic conditions were bad, especially in 1929 and 1937 when stock-market losses were the greatest in the history of the country. While stock-market crashes and economic depressions do not excuse negligence and bad faith, they do constitute conditions to be considered in determining whether or not improper conduct has been established.

Many transactions are set out in the voluminous record of this case. The parties attempt to draw favorable conclusions from them. A specific discussion of each would unduly lengthen this opinion. We conclude by stating that the agreement, when considered with the circumstances existing at the time it was made and the conduct of the parties thereafter, establishes a relationship of principal and agent, and not that of trustee and cestui. We conclude further that the evidence does not establish that the agent failed to act in good faith or to exercise reasonable skill, care, diligence, and judgment in acting for the plaintiff. The evidence indicates that Burns, Potter & Company and its officers gave the plaintiff the benefit of the information they had on stock-market conditions generally and on specific investments as well. The proof does not disclose any bad faith on the part of the defendants in so doing. Under these findings, liability on the part of the defendants does not exist. The trial court was therefore correct in so holding and its judgment is affirmed.

AFFIRMED.

PAINE, J., not participating.