**INVESTMENT COMPANY INSTITUTE et al., Plaintiffs,**

v.

**William B. CAMP, Comptroller of the Currency, Defendant.**

**Civ. A. No. 1083–66.**

United States District Court
District of Columbia.

Sept. 27, 1967.

G. Duane Veith, James F. Fitzpatrick, Charles R. Halpern, Arnold & Porter, Washington, D. C., Robert L. Augenblick, New York City, for plaintiffs.

Barefoot Sanders, Asst. Atty. Gen., Harland F. Leathers, Irwin Goldbloom, Stephen M. Truitt, Department of Justice, Washington, D. C., David G. Bress, U. S. Atty., Joseph M. Hannon, Asst. U. S. Atty., Washington, D. C., for defendant.

## OPINION

McGARRAGHY, District Judge.

This action is brought against the Comptroller of the Currency by the Investment Company Institute in its representative capacity of the open-end investment companies, investment advisers and principal underwriters which comprise its membership. The Investment Company Institute (hereinafter called the Institute) is an unincorporated association, having its principal place of business in the city, county and state of New York. The Institute is a national association, having as its members 177 open-end management investment companies and their 88 investment advisers and 78 principal underwriters. The open-end management investment companies which are members of the Institute have assets of $36 billion, representing about 94 percent of the assets of all such companies in the United States, and have approximately 3.5 million shareholders. The other plaintiffs in this action are several individual members of the Institute. They seek an injunction to restrain the Comptroller from authorizing national banks to collectively invest funds tendered to the bank as managing agent solely for investment purposes. They also pray for a declaratory judgment adjudicating the pertinent regulation promulgated by the Comptroller to be invalid.

The action is now before this court on cross motions for summary judgment, all of the parties agreeing that no factual issues exist and that the legal issues are ripe for disposition by summary proceedings.

It is first necessary to review and to delineate the factual background upon which the issues in this action arose and within which these motions are made. In September of 1962 the statutory authority to regulate the fiduciary activities of national banks was transferred from the Board of Governors of the Fed-

eral Reserve System to the Comptroller of the Currency. Pub.L. 87–722, 76 Stat. 668, 12 U.S.C. § 92a. Pursuant to this authority, the Comptroller caused to be published in the Federal Register for February 5, 1963, a proposed revision of the fiduciary regulation, 12 C.F.R. § 9. In addition to the types of collective investment funds permitted under the prior regulation, this proposed revision provided that national banks were authorized to invest funds held in the capacity of managing agent in a collective investment account, 12 C.F.R. § 9.18(a) (3).[1] Moreover, the proposed revised regulation allowed the Comptroller to approve collective investment of such funds in manners other than those expressly provided by Regulation 9, 12 C.F.R. § 9.18 (c) (5).[2]

The Comptroller invited national banks and other interested parties to submit comments pertaining to the proposed regulation. Plaintiff Institute, on behalf of its members, participated to the full degree permitted and submitted a statement in opposition to the proposed regulation. It premised its argument on the same basis that it is presenting before this court, namely, that the revised regulation would allegedly permit activity prohibited by 12 U.S.C. § 92a, and certain provisions of the Glass-Steagall Act, as amended, 12 U.S.C. §§ 24, 78, 377 and 378. Notwithstanding this opposition the final regulation was adopted by the Comptroller on April 5, 1963, and revised by minor modifications on February 5, 1964, 12 C.F.R. § 9.18.

Pursuant to the regulation, on May 10, 1965, the Comptroller approved a plan submitted by First National City Bank of New York (hereinafter referred to as the Bank) for the establishment and operation of a collective investment fund, called the Commingled Investment Account, under Regulation 9, 12 C.F.R. § 9.

The plan as outlined by the Bank differed from the specifically enumerated collective investment funds authorized by the Comptroller's revised Regulation, but the Bank, pursuant to 12 C.F.R. § 9.18(c) (5) sought and obtained the Comptroller's written approval of the plan.

On April 20, 1966, the Bank registered its Commingled Investment Account with the Securities and Exchange Commission pursuant to the Investment Company Act of 1940, 15 U.S.C. § 80a–1 et seq. as an open-end management investment company. On the same date, the Bank filed a registration statement with the Securities and Exchange Commission pursuant to the Securities Act of 1933, 15 U.S.C. § 77a et seq., for the purpose of registering the participating interests or units to be issued by its Commingled Investment Account. The registration statement concerning those participating interests or units became effective on June 14, 1966. From that date the Bank has offered and sold to the public participating interests or units issued by the Commingled Investment Account by means of the prospectus for the First National City's Commingled Investment Account.

Before proceeding to the merits of this controversy, it is best at this time to specifically describe the operation of a mutual fund and the operation of the Commingled Investment Account (hereinafter referred to as the Account) so that a better understanding of the problem can be achieved.

Generally, "mutual funds" are open-end management companies engaged in the business of continuously issuing and offering for sale redeemable securities which represent an undivided interest in the fund's assets. Most mutual funds are corporate in form and the securities issued by them usually consist of capital stock. However, there are a number of mutual funds in a variety of noncorpo-

---

1. (3) In a common trust fund, maintained by the bank exclusively for the collective investment and reinvestment of monies contributed thereto by the bank in its capacity as managing agent under a managing agency agreement expressly provid-

ing that such monies are received by the bank in trust.

2. (5) In such other manner as shall be approved in writing by the Comptroller of the Currency.

rate forms and the securities issued by some of them are variously denominated as beneficial interests, participating agreements, and the like. The proceeds from the sale of the securities issued by a mutual fund are invested in a portfolio of securities of various kinds, in accordance with the stated investment policy of the particular fund. Some funds invest primarily in securities offering current income; others concentrate on long-term growth securities; still others specialize in particular industries or classes of securities; and many offer various combinations of objectives. The shareholder in a mutual fund is entitled at any time to redeem his interest, usually at net asset value, or in a few instances upon payment of a charge. To facilitate this redemption privilege as well as to establish a price at which new shares are being offered, the value of a share in a mutual fund is calculated regularly, typically twice daily, on the basis of the market value of the securities held by the fund. Because of the continuous process of redemption, the mutual fund would be restricted and contracted in size, unless it continuously issued and offered new securities for sale.

Except in unique circumstances, virtually no shares in mutual funds are traded from one investor to another, and there is no significant trading market for such shares. In almost all cases, shareholders in mutual funds desiring to obtain cash for their shares redeem them with the issuing company. The securities issued by most mutual funds are offered to the public at a price which includes a sales commission or sales load. There are some mutual funds whose shares are sold with no sales commission being charged. These latter funds are frequently called "no load" mutual funds. The activities of mutual funds are under the control of a board of directors or board of trustees. Directors or trustees are elected annually by the vote of a majority of the fund's outstanding voting securities.

Mutual funds usually contract an outside investment adviser for investment advice and other management services, and with a principal underwriter for the distribution of the fund's shares, pursuant to the statutory pattern established by the Investment Company Act of 1940, 15 U.S.C. § 80a–15. The investment adviser of a mutual fund furnishes advice to the fund with respect to its investment portfolio and the securities it should buy, hold, and sell. In some cases the adviser is empowered to purchase and sell securities for the fund. Some investment advisers also furnish supervisory and administrative services to the mutual fund. The investment adviser receives compensation for its services, usually in the form of a fee based on the total value of the assets being managed.

The principal underwriter of a mutual fund is engaged in the business of selling and distributing the securities issued by the fund to the investing public through brokers or dealers, or directly through the underwriter's own salesmen, or both. The principal underwriter either purchases the securities issued by the fund for resale or acts as agent for the fund in distributing the securities. Except in the case of a no-load fund, the principal underwriter receives a fee for its services, usually in the form of a portion of the sales commission included in the selling price of the shares issued by the mutual fund.

Mutual funds are required to be registered with the Securities and Exchange Commission pursuant to the Investment Company Act of 1940. The activities of the mutual funds and their relationship with affiliated persons and others are all subject to regulation under the Act. The investment advisers and principal underwriters who are plaintiffs herein, perform their services for the mutual funds they serve pursuant to contracts, the terms, execution and continuation of which are subject to the provisions of Section 15 of the Investment Company Act of 1940, 15 U.S.C. § 80a–15. The securities issued by each of the mutual fund members of the Institute are registered with the Securities and Exchange Commission pursuant to the Securities Act of 1933, 15 U.S.C. § 77a et seq. All

such securities are offered to the investing public by means of a prospectus which is initially filed with the Securities and Exchange Commission under the Securities Act of 1933 as part of the registration statement for the securities to which the prospectus relates.

■■ As can be readily ascertained, the mutual fund community is composed of three principal members. First the body corporate of the fund itself whose membership is the general investing public. This relationship is analogous to the common productive corporate structure. However, the primary function of the investment corporation is to obtain the objectives which are outlined in their charter through the mutual investment of the funds contributed by the "shareholders". Aldred Inv. Inst. v. S. E. C., 151 F.2d 254 (1st Cir. 1945) cert. denied 326 U.S. 795, 66 S.Ct. 486, 90 L.Ed. 483 (1945). The relationship between the shareholder and the body corporate is plainly one of contract. Stevenot v. Norberg, 210 F.2d 615 (9th Cir. 1954); see also Schroeter v. Bartlett Syndicate Bldg. Corp., 8 Cal.2d 12, 63 P.2d 824, 825; Ellingwood v. Wolf's Head Oil Refining Co., 27 Del.Ch. 356, 38 A.2d 743, 154 A.L.R. 406 (1944); Corporations, 18 Am. Jur.2d § 463 (1965).

■ The management function of the mutual fund lies with the board of directors. They have essentially the equivalent powers as any corporate board of directors. In the same manner they are also responsible to their shareholders as fiduciaries. Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); Brown v. Bullock, 194 F.Supp. 207 (S.D. N.Y.1961), affirmed 294 F.2d 415 (2nd Cir. 1961).

The board of directors within its broad scope of authority has the power to enter into contracts with the other two members of the mutual fund community, that is the investment advisers and the underwriters. The functions performed by the latter two members of the mutual fund community is essential for the propagation of the investment or the mutual fund corporation. The interrela-tionship of these independent entities is one of contract which essentially determines the respective position occupied within the structure by each member. The independence of each member is governed by statute as is their interdependence; see the Investment Company Act of 1940, 15 U.S.C. § 80a–1 et seq.

The above few paragraphs outline the general operation of the mutual fund structure. A similar outline is now presented for the operation of the Account as created by the Bank and approved by the Comptroller pursuant to Regulation 9.

The Account as established by the Bank, operates as follows: the investor-customer tenders his funds, $10,000 or more, to the Bank pursuant to a broad authorization making the Bank the customer's managing agent. There is thus created a principal-agent relationship between each individual investor-customer and the Bank. The authorization includes specific authority for the Bank to invest the customer's funds, together with the funds of other customers who have given the equivalent authorization, through the commingled Account. Funds in the commingled Account are invested in a pool of securities, principally common stocks and securities convertible into common stocks, offering the opportunity for long term growth of capital and income. The Account is divided into "units of participation" of equal value in order to determine conveniently the proportionate interest of each participant. No certificates indicating the "units of participation" are issued by the Bank; however, the participant is informed by a nonnegotiable document as to how many "units of participation" are contained in his account.

A participation is transferable only to another person who has validly appointed the Bank as managing agent, and, because of the underlying agency relationship, the interest of a participant terminates upon his death or incompetency and his funds are withdrawn from the Account and held for his legal representatives. There is no sales charge imposed on amounts invested in the com-

mingled Account nor is there any redemption charge incurred upon withdrawal from the Account. An investor-customer may terminate his participation in whole or in part on the basis of the net asset value of the units of participation being redeemed. The net asset value of each unit of participation is determined as of the close of business of each of a number of specified valuation dates by dividing the net asset value of the Account as of the close of business on the valuation date by the number of units of participation then outstanding.

The operation of the Account is supervised by a Committee of five persons, who act essentially as a board of directors of the Account. Initially the members were appointed by the Bank, but hereafter are to be elected annually by the participants. Each participant will be entitled to vote at the election of the Committee members and his vote will be weighted according to the number of "units of participation" in his account. At least 40% of the members of the Committee must at all times be persons not affiliated with the Bank, but the majority of the members may be, and are expected to be, officers in the Bank's Trust and Investment Division.

The Committee is authorized to enter into a management agreement with the Bank. The agreement and any amendments thereto must be approved by more than 50% of the participants at their annual meeting and the Comptroller's approval thereof must also be obtained.

In accordance with the management agreement, the Bank serves as investment adviser and custodian for the Account. The Bank, therefore, maintains a continuous investment program consistent with the commingled Account's stated investment policy; it will determine what securities are to be purchased and sold, and will execute all transactions. The management agreement provides that the Bank will furnish all administrative, custodial and clerical services required by the Account and will pay all the organization costs and expenses. Subsequent maintenance fees, the cost of

independent professional services, such as legal, auditing and accounting services, and the cost of preparation and distribution of notices to participants and proxy statements are to be borne by the commingled Account. The Bank will, however, reimburse the Account for the compensation and expenses, if any, paid by the Account to the members of the Committee who are not affiliated with the Bank; the other members of the Committee will receive no separate compensation for their services to the Account. For these services the Bank receives a fee equal to ⅛th of 1 per cent of the average of the net asset value of the Account taken on each valuation date during each fiscal quarter, which is approximately ½ of 1 per cent on an annual basis.

Essentially, the commingled management agency Account as delineated by the Bank's plan consists of two principal members, the first being the membership of the Account consisting of the investor-customer, and the second being the Bank which occupies a dual position, one as investment adviser to the Account and the other as general agent to the participants of the Account. The Bank can also be considered to occupy the position of underwriter for the units of participation which are issued to the investor-customer. The Committee of the Account occupies a position equivalent to that occupied by the board of directors of the mutual funds.

The Account has been approved by the Comptroller, even though it does not essentially comply with all provisions of Regulation 9 as promulgated by him. This action indicates that even though the Account as presently structured does not meet every minute detail of the Regulation, any future plans similar to the one established by the Bank will obtain his approval under 12 C.F.R. § 9.18(c) (5). Therefore, it is not necessary for this court to analyze the differences between the Account as established by the Bank and Regulation 9. For the disposition of the issues before this court, the Account will be treated as if it completely

meets the substantive requirements of Regulation 9. 12 C.F.R. § 9.

Before the merits of the issues in this case can be reached, two preliminary procedural matters must be noted. The Comptroller interposes the objection that the plaintiffs lack standing to sue, and that there is no justiciable issue before this court.

These issues—standing and justiciability—are nominally termed procedural only to differentiate between the initial hurdles which a plaintiff must overcome in order to obtain a judicial determination of his action on the merits, and the actual adjudication of the case on its substantive issues. This characterization often borders on mere semantics, since in order to obtain the proper perspective and focus upon the essence of these issues, as here, the substantive law upon which the plaintiffs premise their action must also be taken into account.

Standing has been, and remains, one of the most enigmatic areas of the law. 3 Davis, Administrative Law Treatise, § 22.18, at 291–92, n. 3. The courts have not developed a single formula which can be applied to a set of facts to determine whether a plaintiff has or does not have standing. The ever changing concepts which have been used in this area of the law can be readily ascertained by the many cases which have been cited in the briefs of both parties upholding their contentions. Due to the pervasiveness of definition in this area, the court is left with no alternative but to examine the long list of cases which hold that a particular plaintiff has standing on one hand, and on the other the long list of cases where the plaintiff has been denied his day in court because of the lack of standing.

■ Standing has been generally expressed by an indication that the alleged aggrieved party has asserted a legal right which was his to assert, or has been injured, or has been threatened with injury. Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940), cf. FCC v. Sanders Bros. Radio

Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940), Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). But standing should not be confused with the doctrine of standing to sue which provides that in an action in a federal constitutional court, by a citizen against a government officer in his official capacity, there is no justiciable controversy unless the citizen shows that such conduct invaded or will invade a private substantive legally protected interest. Associated Industries of New York v. Ickes, 134 F.2d 694, 702 (2nd Cir. 1943) vacated as moot, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414 (1943), but see Scott v. Macy, 121 U.S.App.D.C. 205, 349 F.2d 182 (D.C.Cir. 1965). The former standing is basically a means by which courts can accept or refuse jurisdiction, and it generally alludes to the capacity of a party to obtain judicial review of an administrative action. See United States v. Storer Broadcasting Co., 351 U.S. 192, 197, 76 S.Ct. 763, 100 L.Ed. 1081 (1956) and Jaffe, Primary Jurisdiction, 77 Harv.L.Rev. 1037 (1964). The doctrine of standing to sue is generally directed towards the capacity of a plaintiff to present his case before a district court *ab initio*.

■ The question as to whether a plaintiff may obtain judicial relief in cases like this has been variously phrased, but the many appellations which have been devised do not detract from the underlying policy objective which permeates each of these cases. This policy is well enshrined in Article III, § 2 of the United States Constitution, that is, a "constitutional" federal court cannot be given power to sit in judgment and revise administrative action, since there is no justiciable controversy and the opinion thus issued would merely be advisory. See concurring opinion of Mr. Justice Frankfurter in Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 149, 150, 71 S.Ct. 624, 95 L.Ed. 817 (1951), Muskrat v. United States, 219 U.S. 346, 354, 31 S.Ct. 250, 55 L.Ed. 246 (1911), Chicago & Southern Airlines, Inc. v. Waterman Corp., 333 U.S. 103,

113, 68 S.Ct. 431, 92 L.Ed. 568 (1948), United Public Workers of America v. Mitchell, 330 U.S. 75, 89, 67 S.Ct. 556, 91 L.Ed. 754 (1947), Associated Ind. of New York v. Ickes, supra.

 Standing to challenge an administrative action can be premised on a statutory provision specifically appended to the statute under which the administrative action was promulgated or where the provision for review has been made generally applicable by the Administrative Procedure Act, 5 U.S.C. §§ 701–704 (recodified by Pub. Law 89–554, 80 Stat. 378). Since there is no specific provision for review of the Comptroller's regulation within the terms of the enabling statute, Title 12, Section 1 et seq., the terms of the Administrative Procedure Act will apply. Citizens Nat. Bank of Maplewood v. Saxon, 249 F.Supp. 557 (D.C.Mo.1965), affirmed Webster Groves Trust Co. v. Saxon, 370 F.2d 381 (8th Cir. 1966). See also United Gas Pipe Line Co. v. F. P. C., 86 U.S.App. 314, 181 F.2d 796 (1950), cert. denied 340 U.S. 827, 71 S.Ct. 63, 95 L.Ed. 609 (1950).

The pertinent section of the Administrative Procedure Act specifically provides that:

> "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

Under this statutory provision a plaintiff must allege that he has suffered a legal wrong or that a legally protected right will be adversely affected or aggrieved by the agency's action in order to obtain standing before this court. The plaintiffs here are alleging that they are suffering a legal wrong by the allegedly illegal competition made possible by the Comptroller's regulation, thereby being adversely affected or aggrieved. The ex-

act amount of damages which will be incurred by the plaintiffs is rather difficult to assess in precise figures, but the Comptroller has predicted that over the next five to ten years, commercial banks might capture as much as two billion dollars of mutual fund business.[3] The defendant interposes that the competition, even if illegally promulgated, does not create any legal wrong for which the plaintiffs may complain.

In support of its contention that the plaintiffs are not suffering any legal wrong and thereby lack standing to challenge the Comptroller's regulation, the defendant relies on a series of cases which contain the general principle that mere competitive injury made possible by governmental action does not confer standing on the injured party to restrain governmental action. Tennessee Electric Power Co. v. TVA, 306 U.S. 118, 137, 59 S.Ct. 366, 83 L.Ed. 543 (1938); Alabama Power Co. v. Ickes, 302 U.S. 464, 479, 58 S.Ct. 300, 82 L.Ed. 374 (1937); Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940); Texas State AFL–CIO v. Kennedy, 117 U.S.App.D.C. 343, 330 F.2d 217, 218 (1964); Benson v. Schofield, 98 U.S.App. D.C. 424, 236 F.2d 719 (1956), cert. denied 352 U.S. 976, 77 S.Ct. 363, 1 L.Ed. 2d 324 (year); Kansas City Power & Light Co. v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 924 (1955), cert. denied 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955). In these cases, the plaintiffs alleged that they were suffering economic loss from the government created competition, but it is significant to note that the competition created by government action in these cases was specifically authorized and sanctioned by Congress and was based upon specific statutory grounds.

Moreover, most of the cases cited by the defendant in support of his allegation that the plaintiffs lack standing have been assiduously distinguished by subse-

---

3. Hearings on H.R. 8499, 9410 before the Commerce and Finance Subcommittee of the House Committee on Interstate and Foreign Commerce, 88 Cong.2d Sess. p.

26 (1964). See also Comment, Of Banks and Mutual Funds: The Collective Investment Trust, 20 Sw.L.J. 334 (1966).

quent decisions of the Supreme Court, even though they have not been expressly overruled. In City of Chicago v. Atchison, Topeka & Santa Fe Railway, 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958), the Supreme Court gave explicit recognition to a competitor's standing to challenge illegal competition. That case involved two competitors, one of whom (Parmlee) had alleged that the other (Transfer) was operating illegally because it had not complied with certain licensing requirements imposed by the City of Chicago. Transfer argued that Parmlee had no standing to object to Transfer's allegedly illegal competition, but this argument was flatly rejected by the Court:

> "It is enough, for purposes of standing, that we have an actual controversy before us in which Parmelee has a direct and substantial personal interest in the outcome. Undoubtedly it is affected adversely by Transfer's operation, Parmelee contends that this operation is prohibited by a valid city ordinance and asserts the right to be free from unlawful competition.
>
> \* \* \* \* \* \*
>
> . "[Transfer] argues that a party has no right to complain about lawful competition, citing Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374, and Tennessee Electric Power Co. v. Tennessee Valley Authority, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543. We do not regard either of these cases as controlling here. It seems to us that Transfer's argument confuses the merits of the controversy with the standing of Parmelee to litigate them. \* \* \* Parmelee's standing could hardly depend on whether or not it is eventually held that Transfer can lawfully operate without a certificate of convenience and necessity." 357 U.S. 77, at 83–84, 78 S.Ct. 1063, at 1067.

With regard to some later cases holding that competitors had standing, see American Trucking Ass'ns, Inc. v. United States, 364 U.S. 1, 80 S.Ct. 1570, 4 L.Ed. 2d 1527 (1960), National Motor Freight Traffic Ass'n v. United States, 371 U.S. 223, 83 S.Ct. 311, 9 L.Ed.2d 273, rehearing denied 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963), affirming 205 F. Supp. 592 (D.C.D.C.1962) only on the merits but not as to the standing issue; Philco Corp. v. FCC, 103 U.S.App.D.C. 278, 257 F.2d 656 (1958), cert. denied 358 U.S. 946, 79 S.Ct. 350, 3 L.Ed.2d 352 (1959); Whitney National Bank in Jefferson Parish v. Bank of New Orleans & Trust Co., 116 U.S.App.D.C. 285, 323 F. 2d 290 (1963), rev'd on other grounds, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965).

In two recent cases challenging the authority of the Comptroller to promulgate regulations under other sections of the banking statutes, the plaintiffs have been granted standing to challenge the regulations over the objections of the Comptroller. Since these cases are directly in point they will be discussed at length. In Baker, Watts & Co. v. Saxon, 261 F. Supp. 247 (D.C.D.C.1966), a number of plaintiffs, engaged in underwriting and distributing revenue bonds, sought a declaratory judgment that the Comptroller's regulations authorizing commercial banks, for the first time, to enter the revenue bond business violated the Glass-Steagall Act. The Comptroller raised the standing defense, citing the identical cases as brought forth in his present argument. Judge Holtzoff summarily disposed of that contention by stating:

> "The gravamen of the plaintiffs' claim for relief is that they are being subjected to competition by illegal activities of national banks. While no one may maintain a suit to restrain lawful competition merely because he is suffering an economic detriment, nevertheless, a person has a standing to complain against illegal competition, or specifically, against competition on the part of a person who lacks the legal right or power to pursue the competitive activities." 261 F.Supp. at 248.

Judge Holtzoff's opinion focuses not on the impairment of the plaintiffs' competitive position by the unlawfully created competition, but rather on the premise that but for the illegal competition

condoned by the Comptroller's regulation, the plaintiffs would not have any economic detriment to base their complaint.

Likewise, in Georgia Association of Independent Insurance Agents, Inc. v. Saxon, 260 F.Supp. 802 (N.D.Ga.1966), the district court denied a motion to dismiss for lack of standing. In that case the Comptroller had authorized, for the first time, national banks to sell insurance in towns with more than 5000 people, even though Section 92 of Title 12 of the United States Code permitted banks to act as insurance agents only in places with a population of 5000 or less. Plaintiffs were insurance agents and trade organizations representing insurance agents. Plaintiffs there alleged that the Comptroller was acting beyond his authority to issue the ruling which was in direct violation of 12 U.S.C. § 92 and that, as a result, national banks were able to illegally compete with the plaintiffs. The district court, in reaching its conclusion, observed that:

> "In Tennessee Electric Power Co., supra, and in Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1937), the plaintiffs alleged that they were suffering economic loss from the government-created competition. In both cases the Supreme Court held that such economic loss alone did not confer standing on the aspiring plaintiffs. It is important to note that such competition was authorized by Congress and was based upon statutory grounds.
>
> "In the instant case, the competition complained of is not explictly authorized by statute, but rather is impliedly prohibited by the congressional grant of the power * * *." 260 F.Supp. at 803.

The district judge, in denying the Comptroller's motion to dismiss, further stated:

> "The Court is of the opinion that the defendant's attack on the plaintiffs' standing is without merit. Title 12 U.S.C.A. § 92 has the effect of protecting insurance agents from certain competition. Surely, the plaintiffs have the right to their day in court to show that the protection afforded them by 12 U.S.C.A. § 92 has been violated." 260 F.Supp. at 804.

Subsequent to its finding of standing, the District Court ruled on the merits of the issues and granted the declaratory judgment and injunction which was sought by the plaintiffs. 268 F.Supp. 236 (N.D.Ga.1967).

Defendant places great reliance in his brief on the recent case of Pennsylvania Railroad Co. v. Dillon, 118 U.S.App.D.C. 257, 335 F.2d 292 (1964), cert. denied sub nom. American Hawaiian Steamship Co. v. Dillon, 379 U.S. 945, 85 S.Ct. 437, 13 L.Ed.2d 543 (1964).

In that case plaintiffs alleged not only that defendant Dillon had exceeded his statutory authority but also that the competitive activity which had been allowed was in and of itself illegal. The competing carriers challenged the authority of the Secretary of the Treasury to enroll certain vessels in the coastwise trade, allegedly in violation of the Merchant Marine Act of 1920, as amended, 46 U.S.C. § 883. That section prohibited the enrollment and documentation of vessels "jumboized" by installation of foreign-made mid-bodies. The Court of Appeals for the District of Columbia Circuit found that the carriers lacked standing even though they alleged the competition was illegal and in violation of the specific provision of the statute. The Court pointed out the dichotomy of Section 10 (a) of the A.P.A., namely the "legal wrong" aspect and the "adversely affected or aggrieved" aspect, as it related to the issue of standing and it concluded that:

> "Under either leg of Section 10(a), therefore, since appellants only complain of government enhancement of economic competition, they must demonstrate 'statutory aid to standing'." 335 F.2d at 295.

After analyzing the enabling statute the Court concluded that "Congress did not intend to insulate coastwise carriers from other domestic competition or to give them any legally protected right to

be free of such competition." 335 F.2d at 295.

A close analysis of the holding in the *Pennsylvania Railroad,* supra, case does not require a determination of the standing issue adverse to the plaintiffs. In that case the Court of Appeals found that the underlying purpose of the statute under which the regulation was promulgated was to stimulate and encourage resort to domestic shipyards and thus to ensure them sufficient business so that their facilities would be adequate at times of national emergencies. 335 F.2d 292, at 295. The statutes, under which the regulation in issue was promulgated, were enacted to establish a clear Congressional policy which sought to separate national commercial banking from the securities business.[4] The primary intent of Congress was to segregate these functions and to allow separate entities to engage in these business areas. This clarity of purpose is garnered not only from the Congressional hearings reports of the Glass-Steagall Act, but also from the exactitude with which Congress has delineated the areas of common interest in this financial structure.[5] This strong general policy against the invasion of either field of endeavor by either entity is sufficient to postulate an interest upon which standing to challenge the regulation may be premised, cf. American Trucking Ass'ns, Inc. v. United States, 364 U.S. 1, 80 S.Ct. 1570, 4 L.Ed.2d 1527 (1960).

Therefore, by implication, the plaintiffs here have a right to complain of the competition which is being condoned under the Regulation. This competition is illegal in the sense that Congress has indicated its policy of separating the two financial institutions and this Regulation allows in an indirect manner a joinder of these interests. The plaintiffs were the recipients by implication of Congressional protection.

Even if this invasion would not in fact cause a palpable injury [6] to be inflicted upon the plaintiffs which could be termed to be a legal wrong under the first leg of Section 10(a) of the A.P.A., now 5 U.S.C. § 702, the plaintiffs could have standing to represent the public interest as held in Sanders Bros. Radio Station v. F.C.C., 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940), Scripps-Howard Radio, Inc. v. F.P.C., 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229 (1942), and F.C.C. v. N.B.C. (K.O.A.), 319 U.S. 239, 63 S.Ct. 1035, 87 L.Ed. 1374 (1943). See the application of this doctrine by Judge Frank in Associated Industries of New York v. Ickes, 134 F.2d 694 (2nd Cir. 1943), vacated as moot 320 U.S. 707, 64 S.Ct. 74 (1943).

The practical effect of the doctrine advanced by those series of cases grants standing to challenge the legality of administrative action to one who is in fact adversely affected by administrative action. Standing in those instances is predicated upon the theory that the plaintiffs do not represent their own private property interests but rather the interests of the public. In the instant situation the plaintiffs could be classified as private "Attorneys General" based on the premise that the public policy dictated by Congress in the Glass-Steagall Act is not being adhered to by the agency charged with its enforcement. See Philco Corp., v. F.C.C., 103 U.S.App.D.C. 278, 257 F.2d 656 (1958), cert. denied 358 U.S. 946, 79 S.Ct. 350, 3 L.Ed.2d 352 (1959), where the competitive interest of a manufacturer and not a broadcaster was held sufficient to satisfy the "person aggrieved" provision of the Federal Communications Act. See also Jaffe, Stand-

---

4. Hearings Pursuant to S.Res. 71 Before a Subcommittee of the Senate Committee on Banking and Currency, 71st Cong. 3rd Sess. (1931).
S.Rep. No. 77, 73d Cong. 1st Sess. (1933).
H.R.Rep. No. 742, 74th Cong. 1st Sess. (1935).
See also 75 Cong.Rec. 9909 (1932) (remarks of Senator Bulkley).

5. Note specifically amendments made to Section 24, par. Seventh of Title 12.

6. Bantam Book v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963)— see also the discussion of the "Adversely Affected in Fact" doctrine promulgated by Prof. Davis, 3 Davis, Administrative Law Treatise § 22.02 (1965 Supp.)

ing to Secure Judicial Review: Public Actions and Private Actions, 74 Harv. L.Rev. 1265 (1961), 75 Harv.L.Rev. 255 (1961), and Davis, 3 Administrative Law Treatise §§ 22.04, 22.05, 22.11 (1958), (Supp.1965).

■ Finally, a denial of standing, as urged by the defendant, would leave the plaintiffs and all others similarly situated without a right to seek redress against capricious, arbitrary and unwarranted Regulations issued by the Comptroller, however flagrant and contrary to the intent of Congress. This court, therefore, holds that the plaintiffs have standing to challenge the Comptroller's Regulation 9.

■ The Comptroller also asserts that there is no justiciable issue or controversy present in this case. This assertion is bifurcated on two grounds. The first is apparently premised upon the theory that the Comptroller's regulation permitting national commercial banks to establish the commingled Account does not regulate nor does it impose any obligation or duty upon the plaintiffs. The standards of justiciability are not limited to those situations in which the plaintiffs are directly regulated by the defendant government official. Indeed, in none of the branch bank cases in which the plaintiff was a state bank did the challenged regulations impose a duty upon or regulate the plaintiffs in any manner. e. g. First Hardin National Bank v. Fort Knox National Bank, 361 F.2d 276 (6th Cir. 1966); First National Bank of Smithfield, N. C. v. Saxon, 352 F.2d 267 (4th Cir. 1965); Union Savings Bank of Patchogue v. Saxon, 118 U.S.App.D.C. 296, 335 F.2d 718 (1964); Whitney National Bank in Jefferson Parish v. Bank of New Orleans & Trust Co., 116 U.S.App. D.C. 285, 323 F.2d 290 (1963), rev'd on other grounds 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965), Commercial Security Bank v. Saxon, 236 F.Supp. 457 (D.C.D.C.1964), affirmed First National Bank of Logan, Utah v. Walker Bank and Trust Co., 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343, (1966) rehearing denied 385 U.S. 1032, 87 S.Ct.

738, 17 L.Ed.2d 680 (1967). However, the justiciability assertion made by the Comptroller in each of these cases was decided adversely to the Comptroller.

The district court in Baker, Watts & Co. v. Saxon, supra, summarily rejected the Comptroller's contention, stating that:

"* * * a justiciable controversy obviously exists justifying the Court in entertaining an action for a declaratory judgment. The plaintiffs claim that the defendant is authorizing national banks to conduct certain activities in violation of the law and that these activities trangress the powers of the banks and that they are injurious to the plaintiffs." . 261 F.Supp. at 249.

The second ground for the lack of justiciability is premised on the theory that only the Comptroller can challenge the acts of a national commercial bank when it acts in excess of its powers. However, the primary thrust of the plaintiffs' allegation is directed not at the national bank which is acting under authority granted by the Comptroller, but rather at the scope of the authority under which the Comptroller promulgated the regulation in issue. The district court in Georgia Association of Independent Insurance Agents, Inc. v. Saxon, supra, simultaneous with its denial of the motion to dismiss for lack of standing, rejected the Comptroller's assertions on the issue of justiciability. It unequivocally stated that:

"The defendant further contends that * * * the Comptroller is sole enforcer of the National Banking Act. This contention is impliedly repudiated by the repeated decisions that banks have standing to challenge an allegedly illegal order * * * and was explicitly repudiated in an opinion by the Fifth Circuit Court of Appeals which stated: 'The fact that the Comptroller is charged under 12 U.S.C. § 93 with the duty of enforcing the National Banking Act certainly does not have the effect of prohibiting actions to enforce that law by any other party who might have a legitimate in-

terest. Jackson v. First National Bank of Valdosta, 349 F.2d 71, at p. 75 (1965).'" 260 F.Supp. at 804.

A recent Supreme Court decision inferentially rejects the Comptroller's arguments on the lack of justiciability, Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The Supreme Court reversed and remanded to the Court of Appeals for the Third Circuit so that the Court of Appeals could consider the issues on the merits. The Court of Appeals had reversed the district court's decision without reaching the merits of the case, Abbott Laboratories v. Celebrezze, 352 F.2d 286 (3rd Cir. 1965). The district court had found that "a justiciable controversy arises where a plaintiff is confronted with substantial present or imminent harm. * * * the very presence of a threat of harm makes the regulations ready for review." 228 F.Supp. 855, 861 (D.C.Del.1964). The Court of Appeals reversed on the basis that no "actual case or controversy" existed as required for justiciability under the Declaratory Judgments Act. However, the Supreme Court decreed that "the impact of the regulations upon the plaintiffs is sufficiently direct and immediate so as to render the issue appropriate for judicial review at this stage." 387 U.S. at 152, 87 S.Ct. at 1517.

■ Having found that the plaintiffs have standing to seek redress and that they have presented a justiciable issue, we are now ready to seek a resolution of the subject matter involved in this litigation.

■ The principal issue involved in this controversy is whether or not the Comptroller has the statutory authority to empower national commercial banks to create, organize and manage the commingled Account. The gist of the activity of managing the Account consists of the purchase and sale of equity securities, nominally for long-term growth of capital and income, for the participating members. National banks have only such powers as are expressly given by federal statute or by necessary implication

therefrom, 12 U.S.C. § 24. Houston v. Drake, 97 F.2d 863 (9th Cir. 1938), Baltimore & O. R. Co., et al. v. Smith, 56 F.2d 799 (3rd Cir. 1932), and in some trust activities they may be authorized to act by the Comptroller in any capacity in which competing state banks are permitted to act. 12 U.S.C. § 92a(a). See First National Bank in St. Louis v. State of Missouri, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486 (1923), and Mercantile National Bank at Dallas v. Langdeau, 371 U.S. 55, 83 S.Ct. 520, 9 L.Ed.2d 523 (1962), City of Yonkers v. Downey, 309 U.S. 590, 60 S.Ct. 796, 84 L.Ed. 964 (1940), rehearing denied 310 U.S. 656, 60 S.Ct. 1071, 84 L.Ed. 1420, and Condon v. Downey, 310 U.S. 656, 60 S.Ct. 1071, 84 L.Ed. 1420, United States v. Palmer, 28 F.Supp. 936 (D.C.N.Y.1939).

Authority to oversee trust activities of national banks which was vested in the Federal Reserve Board of Governors, 12 U.S.C. § 248(k) was repealed in 1962 when authority to regulate the fiduciary activities of national banks was transferred to the Comptroller. 12 U.S.C. § 92a, 76 Stat. 668, Pub.L. 87–722. Upon transfer of this authority the Comptroller issued Regulation 9 pursuant to which the First National City Bank established the commingled Account. In order to determine the validity of Regulation 9, it will be necessary to investigate each section of the relevant statutes and also to determine the intent of Congress when it enacted the relevant statutes. In order to complete the determination of the issues involved, it will also be necessary to determine whether or not the relevant state statute, here the N. Y. Banking Law, McKinney's Consol.Laws, c. 2, Section 100, allows local state banks to act in a similar fashion as is presently being allowed by Regulation 9.

This Regulation authorizes national banks to commingle managing agent accounts, allowing, therefore, the bank to purchase equity securities for the Account in general and not for any specific participating member. The essence of this activity is the purchase and sale of securities deriving thereby a benefit for

the participating members, and fulfilling the stated purpose of the Account.

The first statutory provision which is encountered along the logical progression to our conclusion is 12 U.S.C. § 92a which delineates the trust powers which the Comptroller is authorized to grant to the national banks. Section 92a(a) provides:

"The Comptroller of the Currency shall be authorized and empowered to grant by special permit to national banks applying therefor, when not in contravention of State or local law, the right to act as trustee, executor, administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, committee of estates of lunatics, or in any other fiduciary capacity in which State banks, trust companies, or other corporations which come into competition with national banks are permitted to act under the laws of the State in which the national bank is located."

and under 12 U.S.C. § 92a(j) the Comptroller:[7]

" * * * is authorized and empowered to promulgate such regulations as he may deem necessary to enforce compliance with the provisions of this section and the proper exercise of the powers granted therein." 76 Stat. 668, Pub.L. 87–722 § 1.

Pursuant to this statutory authority the Comptroller can empower national banks the right to act in a fiduciary capacity and to issue regulations controlling this activity. From the statutory language it can be concluded that the Comptroller can grant trust powers to the national banks; but the real crux of this issue is whether or not the commingled Account can be considered a fiduciary activity as provided by the statute.

The Comptroller contends that there can be no doubt that the Bank's relationship to the participants in the commingled Account is a fiduciary relationship; however, this general statement, upon close analysis, is untenable. The principal-agent relationship arises from a contractual agreement between the parties. The nature of this relationship gives rise to certain duties which are implied by the law, namely, a fiduciary duty and a duty of loyalty. The trustee and the agent have an equivalent duty of loyalty. The fiduciary duty of the agent is similar to but not the equivalent of the fiduciary duty of a trustee.

The many differences as to the characteristics of a principal-agent relationship and a trustee relationship are notable especially as they relate to the issue in this case. Consent of both principal and agent is a necessary requirement for the creation of the relation whereas the beneficiary of a trust need not consent. An agent is subject to the control of his principal, but a trustee is not subject to the control of the beneficiary. An agent can bind his principal by contract or otherwise, but a trustee has no such power with regard to his beneficiary. The agency relationship is terminable by the direction of the principal or by his death without any express provision to that effect, but this is untrue with respect to a trust unless the instrument so provides. See Restatement (Second) of Agency, Section 13, comment a, Section 14B, comments e to h, and Section 425, comment a. Note also Bogert, Trusts and Trustees, § 15 (2d. ed. 1965) p. 70 and Restatement of Trusts, 2d § 8, comment i.

The Bank and the individual participant of the Account enter into an agency relationship prior to or simultaneous with the participant's engagement with the Account. The Bank's role in this relationship is one of managing agent, not as trustee for the participant. A leading authority on the law of trusts has stated:

"The duties and powers of the institution [e. g. a bank] as agent are determined by the terms of the contract

---

7. Section 11(k) of the Federal Reserve Act, as amended, 12 U.S.C. § 248(k) (repealed), empowered, in identical terms the Federal Reserve Board to issue regulations.

made with the customer; the duties and powers of the institution as trustee depend not only upon the terms of the trust but also upon the principles and rules of the common law and of statutes which are applicable to the trust relation. The liabilities of the institution as agent depend upon whether it has failed to use due care in the performance of the duties which it undertakes; its liabilities as a trustee depend upon whether it has committed a breach of trust. Ordinarily the responsibilities of the institution are more extensive where it acts as trustee than where it acts as agent, and it may incur no liabilities as agent for conduct which would render it liable if it were trustee." 1 Scott on Trusts, Section 8.1 Bank as Trustee or Agent (2d. ed. 1956).

■ The courts, as well as the recognized authorities in trust law, have distinguished sharply between the responsibilities of a true trustee and those of a managing agent, even where the latter is granted complete discretion in acting for his principal. It is, of course, established that the managing agent occupies a position of confidence, in which he must act with reasonable care and is held to a standard of conduct higher than that which prevails in the ordinary course of business in the marketplace. But the courts have stated plainly that this is not the high standard of care and strict accounting imposed upon a trustee, Stephens v. Detroit Trust Co., 284 Mich. 149, 278 N.W. 799 (1933); Anderson v. Abbott, 61 F.Supp. 888 (W.D.Ky.1945); O'Connor v. Burns, Potter & Co., 151 Neb. 9, 36 N.W.2d 507 (1949). In both the *Stephens* and *O'Connor* cases the principal brought suit for accounting against the defendant managing agent on the basis that they had breached the high duty of care imposed upon a trustee. The decisive factor in both cases was that the relationship which existed between the parties had been freely chosen and established and, having entered into an agency contract, the investor could not assert that the relationship was in fact a trust.[8]

■ Contrary to the contentions made by the Comptroller, the managing agent relationship is not a true fiduciary relationship as it has been defined by the courts and by the recognized authorities in this field. Therefore, it is concluded that the managing agency relationship does not fall within the traditional fiduciary powers as delineated in 12 U.S.C. § 92a(a).

Section 12 U.S.C. 92a(a), however, permits a national bank to act "in any other fiduciary capacity in which State banks, trust companies, or other corporations which come into competition with national banks are permitted to act under the laws of the State in which the national bank is located." This saving provision allows national banks to offer the equivalent fiduciary services to their customers that a local state bank might offer.

The Comptroller has authorized the First National City Bank, located in New York state, to establish a commingled Account pursuant to Regulation 9, and under the competitive provision of 12 U.S.C. § 92a(a) the authorization granted to First National City Bank may be legally valid, if the banking laws of New York state allow competing institutions to establish a commingled Account.

The general powers of state banks in New York state are contained in McKinney's Consol.Laws, c. 2, N.Y. Banking Law § 96 as amended, L.1966, c. 324. These general powers have been supplemented by specific statutory provisions which grant state banks the power to act in a fiduciary capacity, N.Y. Banking Law, §§ 100, 100–a, 100–b, 100–c, as amended. Each of these statutory provisions delineate the authorization of state banks with a definite degree of specificity, and none of the sections noted above allow a commingling of managing agency accounts. The only section which

---

8. But see, Saxon and Miller, Common Trust Funds, 53 Geo.L.J. 994, 1015, and Main, Common Trust Funds, 83 Banking L.J. 565.

could even be deemed to inferentially grant this authority is Section 100-c, which relates to the power of banks to commingle funds held in a fiduciary capacity, specifically requiring that common trust funds be limited to moneys received and held "as executor, administrator, guardian, personal or testamentary trustee, donee of a power during minority to manage property vested in an infant or committee * * *."

■ A search of the New York state case law has failed to reveal any relevant judicial interpretation of this statutory section. However, it has been held that state banks are prohibited to exercise any power which was not expressly granted, O'Connor v. Bankers Trust Co., 159 Misc. 920, 289 N.Y.S. 252 (Sup.Ct.1936) affirmed 278 N.Y. 649, 16 N.E.2d 302; see also Nassau Bank v. Jones, 95 N.Y. 115, 47 Am.Rep. 14, (Ct. of App.1884). These decisions indicate that New York state courts follow the federal rule, applicable to national banks, as expressed in Calif. Bank v. Kennedy, 167 U.S. 362, 17 S.Ct. 831, 42 L.Ed. 198 (1897), that the exercise of power not expressly granted to a national bank is prohibited. This restrictive interpretation of the powers granted under Section 100-c is further substantiated by noting that when the New York legislature has wanted to broaden the categories of accounts held and administered by banks which could be invested in a common trust fund, it has amended Section 100-c to do so.[9]

■ It is the conclusion of this court that the commingling of managing agency accounts is not authorized either under the federal statutes or the New York banking laws.

Even if the managing agency accounts could be considered bona fide fiduciary activities, and, therefore, authorized by the present statutes, the commingling of these accounts would still be illegal under the provisions of the Glass-Steagall Act. In order to arrive at this determination it is necessary to make an exact characterization of the Account which was established.

■ As noted in the early section of this decision, a mutual fund continuously issues its own securities as does the commingled Account. A mutual fund invests the proceeds from the sale of its securities in a diversified investment portfolio, in the same manner as the commingled Account. The mutual fund shares obtains for the investor an undivided interest in the fund's portfolio, as does a unit of participation in the commingled Account. Within certain limitations, a participating member of the Account can redeem his units of participation in a similar manner as the holder of mutual fund shares. A majority of the participating members elect the members of the Committee, who oversee the affairs of the Account in much the same manner as mutual fund stockholders elect their board of directors or trustees. The SEC has required the Account to register as an investment company under the Investment Company Act of 1940, 15 U.S.C. § 80a-1 et seq. The SEC pursuant to its authority under 15 U.S.C. § 80-3(c), has granted certain exemptions to the requirements of the Investment Company Act as it relates to board membership;[10] nevertheless it has recognized the similarity between the Account

---

9. For example, that section was amended to permit a state bank acting as the "donee of a power during minority to manage property vested in an infant" to place the property so managed in a common trust fund, L.1958, c. 496 § 1; L.1965, c. 824 § 5. Note also the specific accounting and notice provisions which are contained in Section 100-c as strictly construed by the courts in In re Lincoln Rochester Trust Co., 201 Misc. 1008, 111 N.Y.S.2d

45 (1952). See also New York Banking Board Regulation, 3 N.Y.C.R.R. 11.91 which states that a common trust fund "may be operated only for true fiduciary purposes."

10. The exemptions which were granted are being challenged in the Court of Appeals for the District of Columbia Circuit, National Association of Securities Dealers, Inc. v. Security Exchange Commission, Appeal No. 20,164, decided Nov. 21, 1967.

and an investment company.[11] The Bank and the Committee have entered into a contractual agreement under which the Bank performs managing and advising functions for the Account. This contract is the equivalent of the contracts which are entered into by the mutual funds and their investment advisers. These contracts are subject to and must be submitted for review by the SEC under the provisions of the Investment Company Act. There are some differences between a mutual fund and a commingled Account,[12] but these are not substantially sufficient to create a legal differentiation between the two investment vehicles. The similarities between these related activities are a sufficient basis to draw an analogy from which an equivalency can be premised.

The Comptroller attempts to differentiate between the mutual fund investment vehicle and the commingled Account by attempting to establish a major difference between a mutual fund share and a unit of participation. This differentiation is premised on the basis that the unit of participation is not a security as such. This is mere tautology and a matter of semantics.

■■ The United States Supreme Court has noted that for the purposes of the Securities Act of 1933 the test for a security is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others. SEC v. W. J. Howey, Co., 328 U.S. 293, 301, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). See also S.E.C. v. Variable Annuity Life Ins. Co., 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959) and Prudential Insurance Co. of America v. S.E.C., 326 F.2d 383 (3rd Cir. 1964), cert. denied 377

U.S. 953, 84 S.Ct. 1629, 12 L.Ed.2d 497 (1964). Under this all encompassing definition, in its most comprehensive sense, whenever an investor relinquishes control over his funds and submits their control to another for the purpose and hopeful expectation of deriving profits therefrom he is in fact investing his funds in a security. The unit of participation in the commingled Account is in fact a security and has been so recognized by the SEC by its requirement that the Bank register the units of participation under the Securities Act of 1933.

■ The Comptroller argues, however, that the definition of "securities" for the purpose of the Securities Act of 1933 is not applicable to define "securities" as the term is used in the Glass-Steagall Act. He asserts that this definition as judicially and administratively derived has no relevance to the meaning of the various provisions of the national banking laws. He bases this assertion on the allegedly different purposes which the laws have, namely that the securities laws were enacted to protect the interests of investors while the banking laws were enacted to protect the country's credit and currency and the solvency of the national banks. This differentiation fails to focus upon the primary essence of the complete regulatory scheme which the Congress enacted to mitigate the problems that the country faced in the 1930s. Congress, after extensive investigation, realized that the financial community needed stabilization in order to overcome the debacle which arose in 1929 and to prevent any further recurrences. It would be inconsistent to conclude that Congress did not intend to obtain the equivalent meaning for the term "securities" as used in the Securities Act of 1933 when it used the

11. The similarity between mutual funds and the Account have been noted by many authorities in the financial community, see Hearings on S. 2704 on Collective Investment Funds Before the Subcommittee on Financial Institutions of the Senate Committee on Banking and Currency, 89th Cong.2d Sess. (1966); University of Pennsylvania Law School Conference on Mutual Funds, 115 U.Pa.L.Rev. 669; and Comment, Of Banks and Mutual Funds, 20 Sw.L.J.

12. See Hearings on S. 2704 (1966) supra, at pp. 55 and 56.

term in the Glass-Steagall Act which was enacted by the same Congress.[13]

By finding that the Account is an equivalent investment vehicle to a mutual fund and that the units of participation are in fact securities, it is, therefore, necessary to determine whether or not the Bank is barred from these activities by the provisions of the Glass-Steagall Act, Sections 16, 20, 21 and 32, codified in 12 U.S.C. §§ 24, 377, 378 and 78 respectively.

The first relevant section is 12 U.S.C. § 24 dealing with the explicit powers granted to the national banks by the Congress. For our analysis only paragraph Seventh is pertinent. It states:

"To exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of this chapter. The business of dealing in securities and stock by the association shall be limited to purchasing and selling such securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for its own account, and the association shall not underwrite any issue of securities or stock: *Provided,* That the association may purchase for its own account investment securities under such limitations and restrictions as the Comptroller of the Currency may by regulation prescribe. * * * "

13. The Federal Reserve Board has repeatedly ruled that participations or shares in mutual funds are securities for purposes of the Glass-Steagall Act, and it has similarly characterized the units of participation in the bank sponsored commingled managing agency account, Federal Reserve Board Legal Memorandum,

The power of national banks to deal in securities has had a motley history, both legislatively and judicially. In 1823 the Supreme Court held that a prohibition against a national bank's trading and dealing in stocks was nothing more than a prohibition against engaging in the ordinary business of buying and selling stocks for a profit and it did not include purchases resulting from ordinary banking transactions. Fleckner v. Bank of the United States, 8 Wheat, 338, 351, 21 U.S. 338, 351, 5 L.Ed. 631 (1823). In First National Bank of Charlotte v. Nat. Exchange Bank, 92 U.S. 122, 23 L.Ed. 679 (1875), the Supreme Court stated that "Dealing in stocks is not expressly prohibited; but such a prohibition is implied from the failure to grant the power." 92 U.S. at 128. The Court in the First National Bank case was interpreting, Rev.Stat. § 5136, par. 7, 15; 15 Stat. 101 § 8, the forerunner of 12 U.S.C. § 24, par. 7 which delineated the powers of the national banks.

The limitation on the national bank's power in security dealings was reiterated in subsequent decisions of the Supreme Court. Concord First National Bank v. Hawkins, 174 U.S. 364, 371, 19 S.Ct. 739, 43 L.Ed. 1007 (1898); California Nat. Bank v. Kennedy, 167 U.S. 362, 17 S.Ct. 831, 42 L.Ed. 198 (1897); McCormick v. Market National Bank, 165 U.S. 538, 17 S.Ct. 433, 41 L.Ed. 817 (1896); see also Birdsell Mfg. Co. v. Anderson, 20 F.Supp. 571 (W.D.Ky. 1937) affirmed 104 F.2d 340 (6th Cir. 1939), and Michelsen v. Penney, 135 F.2d 409, 424 (2nd Cir. 1943).

This implied limitation caused the national banks to establish security affiliates, organized under state law, to profit from underwriting and dealing in stocks and other securities. In 1927 Congress passed the McFadden Act which added

"Legal Considerations Under Section 32 of the Banking Act of 1933 in Connection With the Proposed Commingled Investment Account of First National City Bank of New York" (Dec. 15, 1965) reprinted in Hearings on S. 2704 (1966) at 581–588.

to the list of banking powers in paragraph Seventh of Section 5136 of the Revised Statutes the following proviso:

"Provided, that the business of buying and selling investment securities shall hereafter be limited to buying and selling without recourse marketable obligations evidencing indebtedness of any person, copartnership, association, or corporation, in the form of bonds, notes and/or debentures, commonly known as investment securities, under such further definition of the term 'investment securities' as may by regulation be prescribed by the Comptroller of the Currency * * *. [Act of February 25, 1927 (McFadden Act), Section 2(b), 44 Stat. 1226]"

This proviso was intended to be a confirmation and a regulation of the investment security business which was being conducted by the banks through their security affiliates. H.R.Rep.No. 83, 69th Cong. 1st Sess. (1926). By the provisions of this Act, the national banks were authorized by statute to engage in the business of underwriting and dealing in investment securities.

The storms looming on the horizon were not within the contemplation of very many people in 1927. It was not until 1931 when the Congress, graced with hindsight, sought the primary causes of the debacle which enveloped the country and had its repercussions throughout the world. The Congressional inquiry generated various statutes in an attempt to avoid a repetition of the debacle which had transpired. Among these statutes were the Glass-Steagall Act and the Securities Act of 1933.

The Glass-Steagall Act in particular redefined the powers of the national banks and imposed severe limitations on their activity in the investment security business by amending 12 U.S.C. § 24, par. 7, and adding 12 U.S.C. §§ 78, 377 and 378. Section 24, paragraph Seventh, has been noted above. The other relevant sections are noted below. Section 32 of the Glass-Steagall Act, now 12 U.S.C. § 78, provides:

"No officer, director, or employee of any corporation or unincorporated association, no partner or employee of any partnership, and no individual, primarily engaged in the issue, flotation, underwriting public sale, or distribution, at wholesale or retail, or through syndicate participation, of stocks, bonds, or other similar securities shall serve the same time as an officer, director, or employee of any member bank except in limited classes of cases in which the Board of Governors of the Federal Reserve System may allow such service by general regulations when in the judgment of the said Board it would not unduly influence the investment policies of such member bank or the advice it gives its customers regarding investments."

Section 20 of the Glass-Steagall Act, now 12 U.S.C. § 377, provides:

"After one year from June 16, 1933, no member bank shall be affiliated in any manner described in subsection (b) of section 221a of this title with any corporation, association, business trust, or other similar organization engaged principally in the issue, flotation, underwriting, public sale, or distribution at wholesale or retail or through syndicate participation of stocks, bonds, debentures, notes, or other securities: *Provided,* That nothing in this paragraph shall apply to any such organization which shall have been placed in formal liquidation and which shall transact no business except such as may be incidental to the liquidation of its affairs.

"For every violation of this section the member bank involved shall be subject to a penalty not exceeding $1,000 per day for each day during which such violation continues. Such penalty may be assessed by the Board of Governors of the Federal Reserve System, in its discretion, and, when so assessed, may be collected by the Federal reserve bank by suit or otherwise.

"If any such violation shall continue for six calendar months after the member bank shall have been warned by

the Board of Governors of the Federal Reserve System to discontinue the same, (a) in the case of a national bank, all the rights, privileges, and franchises granted to it under chapter 2 of this title may be forfeited in the manner prescribed in sections 141, 222–225, 281–286 and 502 of this title, or, (b) in the case of a State member bank, all of its rights and privileges of membership in the Federal Reserve System may be forfeited in the manner prescribed in sections 321–332 of this title."

Section 21 of the Glass-Steagall Act, now 12 U.S.C. § 378, provides:

"(a) After the expiration of one year after June 16, 1933, it shall be unlawful—

"(1) For any person, firm, corporation, association, business trust, or other similar organization, engaged in the business of issuing, underwriting, selling, or distributing, at wholesale or retail, or through syndicate participation, stocks, bonds, debentures, notes, or other securities, to engage at the same time to any extent whatever in the business of receiving deposits subject to check or to repayment upon presentation of a passbook, certificate of deposit, or other evidence of debt, or upon request of the depositor: *Provided,* That the provisions of this paragraph shall not prohibit national banks or State banks or trust companies (whether or not members of the Federal Reserve System) or other financial institutions or private bankers from dealing in, underwriting, purchasing, and selling investment securities to the extent permitted to national banking associations by the provisions of section 24 of this title: *Provided further,* That nothing in this paragraph shall be construed as affecting in any way such right as any bank, banking association, savings bank, trust company, or other banking institution, may otherwise possess to sell, *without recourse or agreement to* repurchase, obligations evidencing loans on real estate;

\* \* \* \* \* \*

"(b) Whoever shall willfully violate any of the provisions of this section shall upon conviction be fined not more than $5,000 or imprisoned not more than five years, or both, and any officer, director, employee, or agent of any person, firm, corporation, association, business trust, or other similar organization who knowingly participates in any such violation shall be punished by a like fine or imprisonment or both."

▆ The obvious purpose of these legislative enactments was to divorce the banking business from the security investing business. Congress was so emphatic in promulgating this divorce, that it included a criminal provision to assure the efficacy and continuity of the separation; see 12 U.S.C. § 378(b), supra, and in some instances it imposed money penalties and forfeitures; see 12 U.S.C. § 377, supra. The many pages of legislative hearings reports which preceded the final enactment of the Glass-Steagall Act contain and outline the potential dangers which the involvement of commercial banking in the investment security business created.

These potential dangers were noted by the Comptroller of the Currency in his report of 1920, excerpts of which were cited by the Subcommittee of the Senate conducting the investigation:

"Some 'securities companies' operating in close connection with, and often officered by, the same men who manage the national banks with which they are allied, have become instruments of speculation and headquarters for promotions of all kinds of financial schemes. Many of the flotations promoted by the 'securities corporations' which are operated as adjuncts to national banks have proven disastrous to their subscribers, and have in some instances reflected seriously not only upon the credit and the standing of the 'securities companies' by which they are sponsored, but also in some cases have damaged the credit and reputa-

tion of national banks with which the 'securities companies' are allied.

"It has been established clearly by decisions of the United States Supreme Court that a national bank can not, except as authorized by the Federal reserve act, hold the stock of other national banks or the stock of other corporations; but these adjunct or auxiliary companies whose stockholders are identical with the stockholders of the national banks with which they are connected by various ties and devices frequently deal actively in stocks, and they also sometimes acquire the ownership or control of other banks, National and State, through their stock purchases.

"In times of rising prices and active speculation some of these auxiliary corporations have made large profits through their ventures and syndicate operations, but their losses in other periods have been heavy, and they have become an element of increasing peril to the banks with which they are associated. The business of legitimate banking is entirely separate and distinct from the kind of business conducted by many of the 'securities corporations', and it would be difficult, if not impossible, for the same set of officers to conduct safely, soundly, and successfully the conservative business of the national bank and at the same time direct and manage the speculative ventures and promotions of the ancillary institutions. These varying institutions demand a different kind of ability and experience on the part of those who manage them, and the two types of business when combined with one management are likely to be operated to the advantage of neither.

\* \* \* \* \* \*

"These ancillary companies are being used with increasing frequency for promotion of speculation and for dealing in bonds and stocks, often those of new and unseasoned issues,

and which are attended with improper hazard risk, and as a means of enabling banks to do, indirectly through their instrumentality, things which they can neither safely nor lawfully do directly." [See Hearings Pursuant to S. Res. 71 Before a Subcommittee of the Senate Committee on Banking and Currency, 71st Cong. 3d Sess. pp. 1067–1068 (1931)]

The Senate Subcommittee Report also outlined the organization and functions of the security affiliates. Among one of these functions was the operation of investment trusts which bought and sold securities purely for investment or speculative purposes, Hearings, S.Res. 71, p. 1057. These investment trusts were the equivalent of our present day investment companies.[14]

Another drawback which the Subcommitte Report recognized was that "in the case of a trust company or a bank with a trust department, the possession of a security affiliate may adversely affect the independence with which fiduciary activities are exercised." Hearings, S. Res. 71, p. 1064.

There can be little doubt as to what Congress intended to do by the enactment of the Glass-Steagall provisions outlined above. Section 16, 12 U.S.C. § 24, par. 7 prohibits national banks from not only underwriting securities directly but also limits the capacity of the national banks in the purchase and sale of securities. Awotin v. Atlas Exchange Bank, 295 U.S. 209, 55 S.Ct. 674, 79 L.Ed. 1393 (1935); cf. United States v. Philadelphia National Bank, 374 U.S. 321, 329, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), First Natl. Bank in St. Louis v. State of Missouri, 263 U.S. 640, 44 S. Ct. 213, 68 L.Ed. 486 (1923), Genessee Trustee Corp. v. Smith, 102 F.2d 125, 127 (6th Cir. 1939), Guaranty Trust Co. v. United States, 44 F.Supp. 417, (E.D. Wash.1942), affirmed 139 F.2d 69 (9th Cir. 1943), United States v. Palmer, 28 F.Supp. 936 (S.D.N.Y.1939). Section

14. S.E.C. Report on the Public Policy Implications of Investment Company Growth, H.R.Rep.No. 2337, 89th Cong. 2nd Sess. p. 33, Fn. 3 (1966).

20, 12 U.S.C. § 377 effectively provides that national banks may not be affiliated with an entity which is engaged principally in the business of purchasing, selling, or underwriting securities. Section 21, 12 U.S.C. § 378 specifically provides that it is unlawful for any entity which is engaged in the business of purchasing, selling, or underwriting to also be engaged in the banking business. Section 32, 12 U.S.C. § 78 prohibits banks and investment organizations from having interlocking directorates, and common officials and employees. Through this legislative scheme Congress intended to separate these previously integrated activities, and it made its intent explicitly clear. Merchants National Bank of Mobile v. Commissioner of Internal Revenue, 199 F.2d 657 (5th Cir. 1952); Commissioner of Internal Revenue v. Merchants Nat. Bldg. Co., 131 F.2d 740, 741 (5th Cir. 1942); cf. Paramount Pictures v. Langer, 23 F. Supp. 890, 902 (D.N.D.1938), reversed as moot 306 U.S. 619, 59 S.Ct. 641, 83 L.Ed. 1025 (1938), Morgan Stanley & Co. v. S.E.C., 126 F.2d 325, 329 (2nd Cir. 1942).

The Supreme Court has stated with specific relation to Section 32, 12 U.S.C. § 78, that "It [Section 32] is a preventive or prophylactic measure. The fact that respondents have been scrupulous in their relationship to the bank is therefore immaterial," Board of Governors of Federal Reserve System v. Agnew, 329 U.S. 441, 449, 67 S.Ct. 311, 415, 91 L.Ed. 408 (1946), see also United States v. Brown, 381 U.S. 437, 454, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965). This "prophylactic" aspect of Section 32 is also inherent in Sections 20 and 21. This is effective legislation against temptation, National Maritime Union of America v. Herzog, 78 F.Supp. 146, 171 (D.C.D.C.1948) affirmed 334 U.S. 354 (1948), and it should not be derogated except by the Congress.

■ The Comptroller contends that the Account has been passed upon and approved by the Federal Reserve Board of Governors as far as its establishment would be contrary to the provisions of Section 32, 12 U.S.C. § 78.[15] In order to support its conclusion the Board promulgated a "single entity" theory, that is, that the Bank and the Account would constitute a single entity for the purposes of Section 32, since the Account would be regarded as nothing more than an arm or department of the Bank. This proposition seems to be based more on nuances of language than on the factual ascertainment of the relationship of the Account with the Bank. The Account is to be governed by an independent board of directors, the Committee, with full policy making authority. The Committee is elected by a majority of the units of participation in the Account and is responsible only to the investor-participants in the Account and not to the Bank. The Bank serves as investment adviser to the Account and also provides administrative services. It performs these services pursuant to a contract which conforms to the requirements of Section 15 of the Investment Company Act, 15 U.S.C. § 80a–15. The contract is terminable at any time, by either party, with sixty days notice and may be continued only upon annual approval of the invest or-participants or of a majority of the Committee, including a majority of the members of the Committee not affiliated with the Bank. The contract will also terminate automatically if assigned by the Bank. When all these factors are taken into consideration, it is obvious that the Bank is contractually affiliated with the Account and cannot, therefore, be considered a department of the bank.[16] The prophylactic provision

15. Hearings, S. 2704 (1966) p. 580–588, supra.

16. Under the provisions of the Account, the participants or a majority of the independent members of the Committee could sever relations with the Bank by electing not to renew the contractual management agreement; practically this may never occur; however, it is possible under the present structure of the Account.

of Section 32 prevents the Bank from being affiliated with the Account.

Furthermore, since it is the conclusion of this court that the Account is in fact an investment fund, the complementary provisions of Sections 20 and 21, 12 U.S.C. §§ 377 and 378, prohibit the Account from being affiliated with the Bank and the Bank from being affiliated with the Account.

██ The Comptroller further contends that the inherent dangers with which the integration of these financial activities was previously fraught are not present in the instant relationship, since the Bank only receives a set fee for managing the Account and does not obtain any remuneration from issuing or underwriting the units of participation. This limitation in probable expected remuneration to the Bank may mitigate the possible aggressive use of the Account by the Bank, but this does not override the clear and unequivocal Congressional mandate that national banks be divorced from investment organizations.[17]

It is a legislative process which determines the newly evolving circumstances which require a change in the statutes. The courts can only enforce and interpret the legislative enactments. The statutes presently in force do not allow a national bank to establish, operate, or be affiliated with an investment fund.

 In view of the statements and conclusions made above, this court holds that the provisions of Regulation 9 which allow commingling of managing agency accounts do not comply with the statutory provision of the Glass-Steagall Act and are, therefore, illegal. The promulgation of these specific provisions allowing a commingling of managing agency accounts is also beyond the power of the Comptroller under Section 92a(a) of Title 12, and it is ordered to be set aside.

The summary judgment motion of the defendant is denied and motion of plaintiffs is granted.

Counsel for plaintiffs will submit an Order in accordance with the foregoing.

---

17. The possible conflicts of interests between the Account and other aspects of the bank's activities are still present, notwithstanding the precautions which were taken by the Comptroller in delineating the powers of the Account. See Banks and Mutual Funds, Comment, 20 Sw.L.J. 334, 341, 342.